JOHN KENNETH LEVESON Ross and Another, Respondents, *v.* ETHEL ADINE Ross and Others, Appellants. (Action No. 1.) *

First Department, November 27, 1931.

*John W. Davis* of counsel [*Emmet, Marvin & Martin*, attorneys for Ethel Adine Ross; *Murray, Aldrich & Webb*, attorneys for the Equitable Trust Company of New York; *Parker & Garrison*, attorneys for James K. M. Ross and Hylda Ross Hodgson, and *Bertram F. Willcox*, guardian *ad litem* for Pamela Joan Ross, Anne Ross Hodgson and Linda Jane Hodgson], for the appellants.

*Nathan L. Miller* of counsel [*H. Bartow Farr* and *Frank B. Ober* with him on the brief; *Hornblower, Miller, Miller & Boston* and *Janney, Ober & Williams*, attorneys for James Hutchison, as trustee, etc.], for the respondent James Hutchison.

MERRELL, J. This action was originally brought by one John Kenneth Leveson Ross in 1927 and is prosecuted by plaintiff James Hutchison, as trustee in bankruptcy of the property of said John Kenneth Leveson Ross, the said trustee having intervened in the action on September 5, 1929. Plaintiff herein seeks to recover possession of certain securities which were delivered by Ross to the Equitable Trust Company of New York, a defendant herein, for the purpose of setting up a trust under the terms of a trust deed executed by said John Kenneth Leveson Ross and Ethel Adine Ross, his wife, and by the said Equitable Trust Company of New York, as trustee. Plaintiff bases his claim to the securities in question upon the contention that the trust attempted to be set up by Ross was void by virtue of the law of the Province of Quebec, where Ross and his wife were domiciled at the time of the execution of the deed of trust. There is no contention that the deed of trust was made in fraud of any creditors of Ross, or that the plaintiff

Hutchison occupies any different position from Ross himself, were he not bankrupt. The trust in question was made over ten years prior to the adjudication of Ross as a bankrupt and at a time when he was a very wealthy man. The action was brought, prosecuted and decided upon the sole theory that Ross himself was entitled to recover and that his trustee in bankruptcy stands in his shoes. The court at Equity Term, by the judgment appealed from, held that the trust, from its inception, was void and contrary to the laws of the Province of Quebec, which the court held governed the parties.

On January 28, 1902, plaintiff John Kenneth Leveson Ross and defendant Ethel Adine Ross, then Ethel Adine Matthews, of the city of Toronto, in the Province of Ontario, Canada, contemplated marriage. Under the law of the Province of Quebec, where John Kenneth Leveson Ross then resided, and where both he and his prospective wife intended to live after their marriage, there was a community of property interest between husband and wife. Under the Quebec Civil Code it was provided that if parties about to marry did not enter into a written marriage settlement, the Code supplied one for them. It is provided by article 1260 of the Quebec Civil Code as follows: " If no covenants have been made, or if the contrary have not been stipulated, the consorts are presumed to have intended to subject themselves to the general laws and customs of the country, and particularly to the legal community of property, and to the customary or legal dower in favor of the wife and of the children to be born of their marriage.

" From the moment of the celebration of marriage, these presumed agreements become irrevocably the law between the parties, and can no longer be revoked or altered."

Article 1265 of the Quebec Civil Code provides that " After marriage, the marriage covenants contained in the contract cannot be altered (even by the donation of usufruct, which is abolished), nor can the consorts in any other manner confer benefits *inter vivos* upon each other, except in conformity with the provisions of the law, under which a husband may, subject to certain conditions and restrictions, insure his life for his wife and children."

On January 28, 1902, the prospective husband and wife entered into an antenuptial agreement at the city of Montreal, executed by the said John Kenneth Leveson Ross and by Adam Rutherford Creelman, the duly authorized attorney of the said Ethel Adine Matthews, whereby it was agreed there should be no community of property between the future consorts notwithstanding the common law of the Province of Quebec, in which they intended to reside, and by the laws of which they should be governed, except in so far as the same might be derogated from by said instrument. It was

provided that the future consorts should hold separate property and estates in accordance with article 1422 of the Civil Code of Lower Canada (Quebec), and that in consequence the future wife would have the entire administration of her property, both movable and immovable, and the free enjoyment of her revenues in as full and ample a manner as if she remained single; that neither of the future consorts should be responsible for the debts of the other, whether contracted before or subsequent to the contemplated marriage. The agreement contained further provisions that each spouse should own his and her property separate and distinct from the other; that the future husband was to pay and bear all household expenses, and was to provide for his future wife and the child or children who might be born of the intended marriage, all necessary support, maintenance and education; that there should be no dower, the future wife renouncing all claim to such dower for herself and for the child or children who might be the issue of said intended marriage. The antenuptial agreement further provided that in view of said intended marriage and of the desire and wish on the part of the prospective husband to make a gift or settlement upon his prospective wife and the child or children which might be born of said marriage, he irrevocably gave, granted and settled upon the prospective wife the sum of $125,000, the same to be taken out of such available assets of the prospective husband as the prospective wife might choose and elect; such donation, however, to take effect only on the death of the said husband, and under and subject to the conditions and provisions that the wife, on the death of the said husband, should be entitled to the use, usufruct, interest and revenues of the said sum of $125,000 during the whole term of her natural life for her support and maintenance and free from seizure or attachment for any debt or liability on her part; that the wife should have the right, in and by her last will and testament, if there were children issue of said marriage, to apportion and appoint the respective shares in which the children of said marriage should take the principal of said donation on her death; that in the event of there being no child or children issue of said marriage, to bequeath and devise the capital of said donation to such persons or person and in such manner as she might decide, absolutely; that in the event of the wife predeceasing the husband, there being issue of said marriage, and said wife having failed by her last will and testament to make appointment between said issue, then the said sum of $125,000 should belong to the issue of said marriage to be shared between such issue, should more than one child be born of said marriage, in equal shares, the shares, however, of any deceased child leaving lawful issue to be taken by

his or her issue *par souches;* that in the event of the wife predeceasing the husband, there being no issue surviving of said marriage, then the said donation was to lapse.

Shortly after the execution of the antenuptial agreement aforesaid John Kenneth Leveson Ross and Ethel Adine Matthews married and became domiciled in the city of Montreal, in the Province of Quebec, where they thereafter continued to reside as British subjects. Prior to December 13, 1916, when the trust agreement now sought to be set aside was executed, Ross received, upon the death of his father, James Ross, and under his will, a large fortune, amounting to about $10,000,000, upon arriving at his fortieth birthday. In 1916 and until 1919 Ross, the settlor, was in service of the British Government, first, in the navy, and, later on, as a member of the Dominion Pension Board at Ottawa. Sometime in the year 1916, Ross, having acquired this immense fortune from his father, conceived the idea that it would be well for him to make some additional provision for the support of his wife and two children, then of the ages of eleven and thirteen years, respectively. At that time he had in his employ a secretary by the name of Hogg, who had previously been in the employ of Ross' father, in like capacity, as a trusted servitor. During the war days of 1916 and prior thereto, Ross was compelled to be continuously absent from the city of Montreal, where he resided, except for occasional visits. He intrusted to Hogg, his secretary, in whom he appears to have reposed complete confidence, the control of his large fortune and the management of his personal interests. Hogg was a lawyer and was trustee of the estate of the elder Ross, with whom he had been associated for many years. Having determined that provision should be made for his wife and children out of his newly-acquired and abundant fortune, Ross instructed his secretary, Hogg, to take steps to create a trust in the State of New York for their benefit. At that time nearly $1,000,000, the property of Ross, was on deposit with the New York agency of the Bank of Montreal, where, indeed, it had been placed by the elder Ross during his lifetime. It was decided by Ross that the trust for the benefit of his wife and children should be in the sum of $1,000,000, and that the funds then on deposit in the city of New York at the agency of the Bank of Montreal should be devoted to such purpose, and that an additional amount should be forwarded to New York to make up the sum of the $1,000,000 trust fund. There was a discussion and an agreement between Ross and his secretary that the Equitable Trust Company of New York was a safe institution to act as trustee. Hogg was dispatched to New York and ascertained the readiness of the Equitable Trust Company to act as trustee, upon suitable terms and conditions. A

correspondence was had between Hogg and the Equitable Trust Company, drafts of a form of trust agreement, prepared by and under which the Equitable Trust Company was willing to act as trustee were exchanged, and, finally, agreed to by Ross and by the trust company. The agreement finally executed bore date November 25, 1916, and was between John Kenneth Leveson Ross, of Montreal, Canada, party of the first part, Ethel Adine Ross, his wife, of the same place, party of the second part, and the Equitable Trust Company of New York, party of the third part. The trust instrument was executed by Ross and his wife, and acknowledged by both before the Consul General at the American consulate at Montreal, Canada. The evidence shows that it was executed at the American consulate pursuant to written instructions from the Equitable Trust Company. Additional securities were required to make up the $1,000,000 trust fund, which were forwarded to the agency of the Bank of Montreal, Ross' agents, in New York, and, finally, the $1,000,000 forming the corpus of the trust was delivered to the Equitable Trust Company of New York and the trust instrument there executed by said trustee on December 13, 1916. Simultaneously with the execution of the instrument the securities in question were turned over to the trustee. These securities consisted of common and preferred stocks of American and Canadian companies. After the securities were received they were held and dealt in by the trustee in the discharge of its duties under the trust instrument. The trust instrument executed by Mr. and Mrs. Ross and by the Equitable Trust Company contains, first, various recitals leading up to the formation of the trust; second, a purported renunciation by Mrs. Ross of her rights under the antenuptial agreement of 1902; and, finally, the trust instrument itself. Under the terms of the trust agreement a primary trust is established for the benefit of Mrs. Ross, with an income to her thereon for life. At the termination of the primary trust, secondary trusts are established for the benefit of the surviving children during their respective lives and until they should attain the age of twenty-seven years; the issue of deceased children to take the share which would otherwise have remained in trust for their parents' benefit; each portion of trust principal so continued in trust for the life of a child was to go outright to each such child upon arriving at the age of twenty-seven years, or, if death ensued before reaching the age of twenty-seven years, to the surviving issue of such child; upon the death of any child before reaching the age of twenty-seven years without issue, the principal of its trust was to be distributed to the surviving children of the settlor and his wife in equal shares or to their issue. It was provided that if Mrs. Ross should die without issue, the

whole principal should go back to the settlor, if living, and if not living, the principal was to pass as a part of his estate under his will, or, if intestate, to his next of kin. By the 3d paragraph of the instrument it was provided that the trustee might sell and reinvest, with the consent of the settlor and his legal representatives, the principal of the trust, and liability for loss should be limited to willful neglect or default. The trust was made irrevocable.

After the trust agreement had been executed, Ross instructed the trust company to send the income to Mrs. Ross at the Bank of Montreal, and for a period of more than ten years, from December 13, 1916, the trust company held the securities which it had received, sold them and reinvested the proceeds, and paid over the income, pursuant to the terms of the instrument, to Mrs. Ross. The wisdom of Ross in providing this trust for the benefit of his wife and children appears to have been vindicated from the fact that by 1926 practically the entire net amount of his fortune, amounting to $9,000,000, had been lost by bad investment or otherwise, and he, at that time, was practically insolvent and was being pressed by creditors. Trust companies in the city of Baltimore, Md., held his notes for large amounts, and were pressing him for payment. At about this time Ross consulted his lawyer, a Mr. Barclay, of Montreal, concerning the preparation of a will, and informed Barclay of the creation of the trust in question. Barclay advised him that the trust was illegal and void. Thereafter Ross went to the Baltimore banks and disclosed to them the advice which he had received from his lawyer and the prospect of his regaining possession of the $1,000,000 trust fund which he had created for the benefit of his wife. The Baltimore bankers were interested in the prospect of improving their position, but refused to do so unless Ross could obtain the consent of his wife to the revocation of the trust. New York counsel advised that through a revocation and the possible illegality of the trust there was a chance to recover the money. Ross then consulted his wife, but instead of telling her of his desire that she revoke the trust which he had created for her benefit and for the benefit of their children, told her that it was necessary for her to execute a paper to cover an irregularity in the trust instrument which otherwise might cause trouble for her and the children; that there was some question in regard to the validity of the $1,000,000 trust, and that he had a paper which he wanted her to sign to fix it up. According to the testimony of Mrs. Ross, she was not informed in any way of the purport of the paper, which she eventually signed without reading it. Ross, in his testimony, fully corroborates his wife and admits having perpetrated a fraud upon her by concealing from her the true intent and purpose of the instrument which he asked her to sign. Believing that it was

merely to cure a defect in the trust deed, Mrs. Ross signed the paper, which in terms was a deed of revocation of the trust. Thereupon, in accordance with his agreement with the Baltimore banks, Ross brought two actions to recover possession of the $1,000,000 trust fund. One of these actions is the action resulting in the judgment appealed from herein, and the other action was a direct action to set aside the deed of trust by virtue of the revocation instrument. At the time when these actions were brought Mrs. Ross was in Europe. When she returned in the spring of 1927, she, for the first time, learned what had occurred, and was informed that proceedings were on foot to deprive her of her trust fund, and that counsel, of whom she had never heard, had been employed to represent her in the action, and that the money constituting the trust fund for the benefit of herself and her children, if recovered, was to be used by Ross to make deposits for his own account in Baltimore and in New York. Mrs. Ross, upon being so informed, at once retained counsel of her own choosing. After conferences between herself and her husband and the lawyers for the respective parties, Ross agreed to discontinue the actions. However, they were not discontinued, but appear to have slumbered for two years, until pressed by the trustee in bankruptcy.

By the decision of the learned justice at Equity Term, the plaintiff's right to a recovery is placed upon the ground that the trust was void in its inception, and that by the trust instrument Ross had never divested himself of the legal title to the property, and that his right to recover the same was not barred by the Statute of Limitations. The court held that the law of the Province of Quebec applied, on the theory that by the antenuptial agreement entered into between the parties in 1902 they had stipulated that the law of Quebec should govern in all their future dealings, and upon the theory that the law of matrimonial domicile was controlling, and that the settlor's domicile governed the validity of the trust, and that the trust was void by reason of the provisions of section 1265 of the Civil Code of Quebec, which provides that "After marriage, the marriage covenants contained in the contract cannot be altered, (even by the donation of usufruct, which is abolished), nor can the consorts in any other manner confer benefits *inter vivos* upon each other." We think the learned justice based his decision on certain unjustified assumptions of fact. The court assumed that Mr. and Mrs. Ross in their antenuptial agreement had expressly stipulated that the Quebec law should govern their future relations, and that the transfer in trust modified and contravened said antenuptial agreement; and, finally, that the trust was set up by Ross in 1916 in consideration of his wife's renunciation of her rights under said

marriage settlement agreement. We think the court was wrong in assuming that in the marriage agreement Mr. and Mrs. Ross had stipulated that the Quebec law should govern their future relations. The learned justice in his opinion erroneously stated that in the original marriage settlement agreement the parties had stated their intention to be governed by the laws of the Province of Quebec " in which they intend to reside and by the laws of which they *wish* to be governed." The agreement, in fact, provided as follows: " No community of property shall at any time hereafter subsist between the future consorts, notwithstanding the common law of the Province of Quebec, in which they intend to reside and by the laws of which they *shall* be governed." It seems to us the language in question is merely descriptive, and not contractual, and is simply a recognition of existing conditions, and not a stipulation as to what law would govern the future acts of the parties elsewhere than in Quebec. At the time of the making of the marriage settlement both parties were under the jurisdiction of Quebec. Therefore, the law of Quebec would govern their rights as against each other, including their rights under the agreement in so far as they did not then agree to the contrary and did not thereafter act together in some other jurisdiction. We think there is nothing in the case that can be construed as an agreement on the part of Mr. and Mrs. Ross never to leave the jurisdiction of Quebec and never to act together under some other sovereign in reference to the laws of such other sovereign. We think there is nothing to be found within the antenuptial agreement preventing the parties from contracting concerning the property which Ross might own in some other jurisdiction. The intent and object of the parties was clearly to settle their rights in accordance with their own wishes, and not in accordance with the laws of Quebec. Indeed, the agreement was made by them for the purpose of taking themselves out of the operation of the Quebec laws; not for the purpose of submitting themselves forever to Quebec law. They were not content to be governed by the statutory law of Quebec, and stipulated that that law should not be binding upon them. There is no reason to believe that the parties then intended to contract that forever the Quebec law should govern their relations, or that it was the intention of the parties that said law should govern a transaction occurring fourteen years later in another jurisdiction selected for the administration of the trust by reason of its fiduciary institutions and laws.

In the antenuptial settlement agreement there is no provision whatever prohibiting Ross from making an additional settlement on his wife and children, and there is no agreement on the part of Mrs. Ross forbidding her to accept such provision for herself and

children. The trust formed by Mr. Ross from his separate property for the benefit of his wife and children contravened no provision of the antenuptial agreement. The only possible violation was a provision of the Quebec statute. It is contended by the respondents that the trust agreement of 1916 was in consideration of the renunciation by Mrs. Ross of her expectancy under the antenuptial agreement of 1902, the respondents contending that Mrs. Ross acquired her interest in the trust fund, not by way of gift, but in consideration of her renunciation of her life estate in the $125,000 expectancy. It seems to us that it is incredible upon its face that Ross should have given his wife a life estate of $1,000,000, from which she was to receive the income, in exchange for her renunciation of a life estate *in futuro* in $125,000, and which life estate would not vest until the death of Ross, and then only if his net estate, after discharge of his debts, equaled that amount. As a matter of fact, the evidence indicates that Mrs. Ross never agreed to a renunciation of her rights under the antenuptial agreement. It is true that Mrs. Ross signed the trust agreement and that therein there appears a renunciation of her rights under the antenuptial agreement. However, it clearly appears that Mrs. Ross signed the trust instrument without reading it, and that she never knew its contents nor agreed to renounce her rights under the marriage settlement. The testimony in this regard is uncontroverted and unimpeached. It, therefore, would seem that the purported agreement should not be construed as a contract or considered as binding upon her. There certainly was no meeting of the minds of the parties with reference thereto. Mrs. Ross denies any such knowledge, and Ross himself admits that she knew nothing of it. Nor does it appear that the trust was created in consideration of Mrs. Ross' renunciation. The recitals in the instrument are as to desire and willingness to renounce, and at most only express an intention to renounce. The instrument does not state that the recitals are part of the consideration. The recitals in a contract form no part thereof, and at most indicate but the purposes and motives of the parties. (*Burr* v. *American Spiral Spring Butt Co.*, 81 N. Y. 175, 178; *Maloney* v. *Iroquois Brewing Co.*, 173 id. 303, 310.)

In our opinion the trial court incorrectly held that the trust agreement was to be governed by the laws of the Province of Quebec. We are of the opinion that the trust agreement, having been executed here, concerning property located here, and administered here, should be governed by the laws of the State of New York. The question presented is one of conflict of laws. If the trust instrument is to be governed by the laws of the Province of Quebec, then the trust was void and the plaintiffs were entitled to recover. If, on the

other hand, the trust was governed by the laws of the State of New York, then it is a valid trust and the plaintiffs cannot recover. In the first place, the State of New York was the place where the final and essential acts to establish the trust were performed. In the second place, the property comprising the trust estate at the time of its transfer and delivery was in the State of New York. Third, the parties clearly intended that the law of New York should govern their trust agreement. Finally, for over ten years the trust was administered in the State of New York. Considering these grounds separately, we are of the opinion that the New York law should be applied because this State was the place where the trust was finally created. When Ross received his large inheritance from his father he instructed his secretary, Hogg, to arrange with the Equitable Trust Company of New York for the creation of a trust. Hogg entered into negotiations with the trust company and the parties finally agreed as to the form of the instrument of trust. The instrument was prepared by the trust company in New York and forwarded to Ross' secretary at Montreal with a suggestion that if satisfactory it should be executed by Ross and his wife, either before a notary public in the city of New York, or before the United States consul in Montreal. The letter transmitting the trust agreement to the secretary of Ross also stated that " If you will have two copies executed by Mr. and Mrs. Ross and return them to us, we will, as soon as we have received the securities, execute the same on our part, and return one of the executed copies to you for Mr. Ross." There clearly was to be no obligation on the part of the trust company until it received the executed instrument from Ross along with the securities forming the trust fund. As before stated, Ross and his wife executed the trust instrument on November 25, 1916, at the American consulate in Montreal. At that time the securities making up the corpus of the trust had not been delivered to the Equitable Trust Company of New York, or to any one in its behalf, or in the behalf of Mrs. Ross. The securities were in the city of New York in the hands of Ross' agent, the New York representative of the Bank of Montreal, and were still under complete dominion and control of Ross until delivered by his agents under his instructions to the Equitable Trust Company. After the instrument was executed by Mr. and Mrs. Ross it was not at once delivered to the Equitable Trust Company or to Mrs. Ross, but was retained by Ross himself. He did not lose control of the instrument even by mailing the same at Montreal addressed to the Equitable Trust Company. Instead of that he forwarded it to his own agent in New York for delivery to the Equitable Trust Company in New York under his instructions, and after the trust company had executed the instru-

ment.  Until the instrument was delivered by Ross to the trustee and had been by the trustee accepted and executed and the securities forming the corpus of the trust had been delivered, the trust was not complete.  The final acts completing the trust occurred on December 13, 1916, in the city of New York.  Until the acts occurring in the city of New York on December 13, 1916, occurred the instrument itself was of absolutely no force or effect and was not binding upon any one.  The signature of the settlor did not create the trust. Until it was finally delivered and executed by the Equitable Trust Company in New York it had no binding effect and might have been destroyed by Ross without affecting the rights of any one.  Had Ross died prior to the delivery of the instrument and the securities constituting the trust fund to the Equitable Trust Company of New York, the entire fund would have remained a part of his estate. The law is too well settled to require the citation of many authorities that any deed or instrument, although fully executed, is without force or effect until delivered.  This rule applies to the transfer of personal property under a written trust.  (*Farmers' Loan & Trust Co.* v. *Winthrop*, 238 N. Y. 477; *McIlhargy* v. *Chambers*, 117 id. 532.) All of the final and essential acts which created the trust occurred in the city of New York.  In *Peabody* v. *Kent* (153 App. Div. 286; affd., 213 N. Y. 154) a resident of the State of Massachusetts executed in New York a deed of trust to three trustees, all non-residents of this State, conveying to them upon trust certain real and personal property located in several States, including some land in the State of New York.  Under the law of New York the trust was invalid.  The court here held that the New York law should apply, saying (at p. 288): " In considering such proposition it will be kept in mind that the deeds were executed, the trustees created and the trusts established in this State where the land is."

In the second place, the situs of the trust estate was in the State of New York.  Prior to the execution of the deed of trust, all of the securities transferred by Ross to the Equitable Trust Company in 1916 were situated in the city of New York.  Most of these securities had been here for a long period of time, antedating ownership by Ross himself, and were held in New York at the office of Ross' New York agent.  Other securities necessary to make up the $1,000,000 were sent down by Ross to his agency in New York, and all were delivered to the Equitable Trust Company in his behalf.  The situs of the proposed trust *res* was in New York. We think the law is well settled that the situs of corporate stock for the purpose of *inter vivos* transfers of title thereto is the place where the certificates are situated.  (*Disconto-Gesellschaft* v. *U. S. Steel Corp.*, 267 U. S. 22; *Simpson* v. *Jersey City Contracting Co.*,

165 N. Y. 193; *McNeil* v. *Tenth National Bank*, 46 id. 325; *Lockwood* v. *United States Steel Corporation*, 209 id. 375; *State of Colorado* v. *Harbeck*, 232 id. 71; 39 Harvard Law Review, 485.)  In *Goetschius* v. *Brightman* (245 N. Y. 186) the Court of Appeals said (at p. 191): " No rule of comity requires this State to subordinate its public policy in regard to transfer made within the State of property situated here to the policy of the State where the owner of the property resides or where he acquired title. Whoever sends personal property to this State or consents to its removal impliedly submits to the regulations of this State concerning its transfer here.  *  *  *  The rights of parties to transactions within the State in regard to property removed to the State with the consent of the owner may properly be governed by the law of the State." A very recent case passing through the Court of Appeals was that of *Weissman* v. *Banque de Bruxelles* (254 N. Y. 488).  Judge POUND, writing for the Court of Appeals, stated (at p. 492): " Unquestionably the modern tendency favors a rule that the law of the situs of the property governs the creation and transfer of interests in tangible chattels, although we find FOLGER, Ch. J., saying quite needlessly in *Edgerly* v. *Bush* (81 N. Y. 199, 203): ' The law of the domicile of the owner of personal property, as a general rule, determines the validity of every transfer made of it by him.'  A transfer of an interest in such property, effective by the law of the situs of the property at the time, is valid even though by the law of the State of domicile no title would have been acquired.  (*Guillander* v. *Howell*, 35 N. Y. 657.) "

In Creighton on Interstate and International Living Trusts — Some Legal Points Involved (50 Trust Companies, 741), the text writer states the rule as follows: " The English rule, universally recognized by the lawyers of that country, is that the law of the *situs* of the trust *res*, where execution of the instruments and transfer of the property occur in that jurisdiction, shall govern.  In other words, I understand that the English courts will uphold as an English settlement a trust made in England covering property located there, the transfer taking place in England, without reference to the laws of the domicile or the nationality of the settlor or any other laws of any other country."

Notwithstanding, respondents contend that in case of a deed of trust of securities the law of the place of domicile of the settlor must govern.  The authorities cited by respondents in support of this contention have no application here, for the reason that it was clearly the intention of the parties in establishing this trust to avoid the operation of such rule.

In the first place, by an amendment to the Personal Property

Law, section 12-a, the public policy of this State is now declared to be: " Whenever a person being a citizen of the United States, or a citizen or a subject of a foreign country, wherever resident creates a trust of personal property situated within this State at the time of the creation thereof, and declares in the instrument creating such trust that it shall be construed and regulated by the laws of this State, the validity and effect of such trust shall be determined by such laws." (Added by Laws of 1930, chap. 849.)

While it is true that in the instrument in question there is no express declaration that it shall be construed and regulated by the laws of this State, yet it is impossible to hold from a consideration of its recitals and terms that the parties did not have that specific intention. The rule that movables follow the person, upon which the cases cited by respondents are based, is not an exclusive rule of universal application, but is one of convenience merely (*State of Colorado* v. *Harbeck, supra*), and where the intention of the parties clearly appears, as here, from the surrounding circumstances as well as from the instrument itself, that such rule shall not apply, the law of this State will not have the effect of overriding that intention.

Most of the securities long before 1916 had been on deposit in the city of New York. The required balance to make up the $1,000,000 was sent down by Ross prior to the execution of the trust agreement. He directed that all the securities be delivered to the Equitable Trust Company by his agent. The trust instrument itself was prepared by the Equitable Trust Company and was strictly a New York form. The paper was executed by Ross and his wife at the American consulate at the suggestion of the Equitable Trust Company in case Ross and his wife could not come to the city of New York for the purpose of execution, and acknowledgment before a New York notary. When he and his wife had executed the same, Ross sent it to his New York agent with directions to deliver the instrument for execution to the Equitable Trust Company along with the securities making up the trust. The instrument itself provided for the appointment of the Equitable Trust Company of New York as trustee. The transfer of the trust estate was in consideration of the payment of one dollar in " money of the United States " and, finally, the trust agreement contained a provision that " Upon the resignation of said trustee, Mr. Ross may in his lifetime or, if he be not living, Mrs. Ross may appoint as successor hereunder any trust company *incorporated under the laws of the State of New York* having a capital of not less than one million dollars, by an instrument in writing similarly executed and acknowledged." (Italics are the writer's.)

It seems to us quite reasonable under the circumstances under which Ross acted in creating this trust that he should make provision for the protection of his wife and children to be administered in and under the laws of the State of New York. Ross at that time was actively in the service of his country in the World War. At the time this trust was created the result of the war was most uncertain. The German armies had made notable advances, and Ross might have well foreseen, from his active participation in military affairs, that the outcome was in grave doubt, and that the success of the German armies might possibly imperil the property and estates of British subjects, including his own. It is not at all strange that he should determine at such a critical time, for the protection of those near and dear to him, that it would be an act of prudence to provide a trust fund of property located in a jurisdiction which was not then involved in the war, and where it would be reasonably safe. There certainly is nothing in the record to show that it was his intent to create a trust to be governed by the laws of Quebec. The contrary clearly appears. The intent of the settlor of a trust is a matter of transcendent importance, and where, as here, it appears to have been the intention of Ross to create a trust to be governed by the laws of New York, such intention should be respected and carried out.

Finally, in our opinion, the trust agreement is to be governed by the law of New York where the trust itself was administered for ten years following its creation. Not only was the Equitable Trust Company selected by Ross to act as trustee, but, as before stated, the instrument provided that in case the Equitable Trust Company should resign or cease to act as trustee, then in its place a New York trust company having a capital of at least $1,000,000 should be substituted as trustee. In the case of *Robb* v. *Washington & Jefferson College* (185 N. Y. 485) a question was involved as to the validity of a trust of personal property *inter vivos*. In that case the domicile of the settlor was New York, but the trust was invalid under the laws of this State. The property was located here at the time of the transfer. The trustee was a Pennsylvania corporation, and the trust, under the instrument, was to be administered in Pennsylvania. The Court of Appeals held that, notwithstanding the trust was invalid in the State of New York, if it was valid in the State of Pennsylvania the funds should be transmitted to that State and the trust upheld. The Court of Appeals (at p. 496) stated: " We are, therefore, of opinion that this trust is invalid under the laws of this State, but we are also of opinion that those laws do not control. The trustee is a corporation created by and located in the State of Pennsylvania.

The fund is to be there held and the trust to be there administered. Therefore, if the trust, though invalid by our law, is legal under the laws of Pennsylvania, the fund should be transmitted to that State and the trust upheld. (*Chamberlain* v. *Chamberlain*, 43 N. Y. 424; *Hope* v. *Brewer*, 136 N. Y. 126.) " Even in the case of testamentary trusts, the New York courts have held that the place of administration is determinative of the validity of the trust. (*Hope* v. *Brewer*, 136 N. Y. 126; *Matter of Sturgis*, 164 id. 485; *St. John* v. *Andrews Institute*, 117 App. Div. 698.)

For the reasons stated, we are of the opinion that the trust in question was a valid one under the laws of the State of New York, and that the same is governed by the laws of this State.

Holding as we do that the trust created by Ross for the benefit of his wife and children was a valid one, it becomes unnecessary to pass upon the appellant's contention, based upon the claimed invalidity of the trust, that plaintiffs' cause of action is barred by the Statute of Limitations.

The judgment of the court below appealed from should be reversed, with costs, and plaintiffs' complaint dismissed, with costs, and, upon appropriate findings, judgment should be entered in favor of defendants and against plaintiffs.

FINCH, P. J., McAVOY, MARTIN and SHERMAN, JJ., concur.

Judgment reversed, with costs, and complaint dismissed, with costs, and judgment directed to be entered in favor of defendants. The findings inconsistent with this determination should be reversed and such new findings made of facts proved upon the trial as are necessary to sustain the judgment hereby awarded. Settle order on notice.