**In re ROMAN CREST FRUIT, INC., Debtor.**

**HUNTS POINT TOMATO CO., INC., Plaintiff,**

**v.**

**ROMAN CREST FRUIT, INC., The City of New York, Department of Ports and Terminals, Tropical Brands Packing Corporation, Arthur Slavin, as Escrowee, Anthony Levatino, and Janet Levatino, Defendants.**

Bankruptcy No. 83 B 11596 (HB).
Adv. No. 83–6055A.

United States Bankruptcy Court, S.D. New York.

Dec. 27, 1983.

Angel & Frankel, New York City, for debtor; Eric S. Brown, New York City, of counsel.

Chester B. Salomon, P.C., New York City, for Tropical Brands Packing Corporation, intervenor.

Gerst & Pullin, Franklin Square, N.Y., for Hunts Point Tomato Co., Inc.; Alan L. Pullin, Franklin Square, N.Y., of counsel.

Siegel, Sommers & Schwartz, New York City, for the Creditors' Committee; James Beldner, New York City, of counsel.

The Corporation Counsel of the City of New York by Robin Weiner, New York City, Assistant Corporation Counsel, for City of New York.

HOWARD C. BUSCHMAN, III, Bankruptcy Judge.

In this action, Hunts Point Tomato Co., Inc. ("Hunts Point"), the plaintiff herein, seeks specific performance of an alleged agreement by Roman Crest Fruit, Inc. ("Roman Crest"), an importer of fruits and vegetables, to assign its interests in four leases covering its stores numbered 269, 270, 273, and 274 at the New York Terminal Market at Hunts Point, Bronx, New York, together with the offices appurtenant thereto and the leasehold equipment, improvements, and refrigeration systems therein [1] (the "Leaseholds").

At the request of Hunts Point, the Supreme Court of the State of New York, Bronx County, issued, *ex parte,* a temporary restraining order barring Roman Crest from transferring the Leaseholds pending resolution of Hunts Point's motion for a preliminary injunction. Shortly thereafter, Roman Crest filed a voluntary petition under Chapter 11 of the United States Bankruptcy Code ("Code"), and removed the state court action to this Court pursuant to 28 U.S.C. § 1478. The temporary restraining order continued in effect pending this Court's decision on Hunts Point's motion for a preliminary injunction as provided in Rule 9027(k) of the Rules of Bankruptcy Procedure and 28 U.S.C. § 1479.

Simultaneously with the removal of this action to this Court, Roman Crest moved for an order vacating the restraining order and dismissing the action. Roman Crest also sought this Court's permission, pursuant to § 363 of the Bankruptcy Code, 11 U.S.C. § 363 (1978) (hereinafter the "Code"), to sell the Leaseholds to Tropical Brands Packing Corporation ("Tropical Brands") for an allegedly higher consideration. Annexed to its application is an agreement entered into by the debtor with Tropical Brands subsequent to the disputed Hunts Point agreement and prior to its filing the Chapter 11 petition for reorganization. Implicit in its § 363 request is that Roman Crest, if its agreement with Hunts Point is deemed to be a contract, rejects or seeks to avoid it.

At a hearing held on November 15, 1983, the parties agreed that resolution of this dispute, i.e., whether there is a contract and, if so, whether it can be rejected or avoided, was necessary prior to entertaining the debtor's motion to sell the Leaseholds. Upon their further consent and because of the debtor's. desire to sell the Leaseholds quickly, the Court ordered, pursuant to Rule 65(a) of the Federal Rules of Civil Procedure, that a trial of the plaintiff's claim for specific performance be advanced and be consolidated with the hearing on the motion for a preliminary injunction and with the debtor's motion to dismiss that portion of the complaint and vacate the restraining order. Trial of its claim for damages was held in abeyance to be heard at a later time. At the urging of the debtor and upon the consent of Hunts Point,

---

1. Hunts Point contends that the equipment items are fixtures. Apparently, this is conceded since none of the other parties has contended otherwise.

Tropical Brands was permitted to be heard and to join in the debtor's defense of this action at trial.

## I.

This controversy has its roots in what began as a simple sale of property in the late summer of 1983 whereby Roman Crest would assign the Leaseholds to Hunts Point for the sum of $100,000. Having negotiated by themselves, the principals and representatives of Hunts Point and Roman Crest, respectively Messrs. Louis Guerra and Anthony ("Pat") Levatino, approached Arthur Slavin, Esq., general counsel to the New York Chapter of the United Fresh Fruit and Vegetable Organization and to the New York Produce Trade Association at Hunts Point, and asked him to formalize their agreement. Apparently on behalf of both sides, Slavin thereupon prepared a written contract, bill of sale and assignment and ordered a title search for liens and encumbrances. He also began the process of obtaining the consent of the City of New York Department of Ports and Terminals, as landlord and as required by the form of contract Slavin had prepared, to the contemplated assignment. Either at this stage or later, the City orally indicated it would approve the assignment to Hunts Point.

But having heard of Roman Crest's financial difficulties, Slavin, for his own reasons, decided only to represent Hunts Point and to inform Levatino that Roman Crest should request its own attorney to review and approve the documents he had prepared. When the parties met on September 9, 1983, Slavin, therefore, advised the parties that, to expedite the transaction, both could sign the agreement, bill of sale and assignment and "then send it [sic] down to Phil Weinstein for his approval and if his approval doesn't come through there is no deal."

Guerra then executed the contract and assignment and assumption agreement on behalf of Hunts Point and gave Mr. Slavin a $10,000 check, drawn on Hunts Point's account, payable to Arthur Slavin, escrowee, representing its down payment, as called for by § 3.1 of the agreement. Levatino, with pen in hand, then, for the first time, revealed that he could no longer sign as an officer or director of Roman Crest since he had resigned those positions and had transferred his stock to his wife.[2] The signatory and acknowledgement pages of the various documents were then changed and Slavin instructed Levatino that he would have to work out the execution details with Weinstein. Levatino took the documents home and, over the weekend, his wife signed them. He then sent them to his attorney's office.

It is at this point that the seamy underside of this simple deal begins to emerge. To Levatino, the transaction contemplated far more than merely the receipt by Roman Crest of $100,000 which would inure to the benefit of its creditors: it was his euphemistic "understanding" that he would be paid, personally, "more or less 'X' amount of dollars in cash" under the table. But by September 12, 1983, when he sent the documents to Roman Crest's attorney, he and Guerra "really hadn't agreed on anything concrete..." with respect to this second deal.

Once Mrs. Levatino had signed the documents, however, Mr. Levatino's ability to insist on an additional cash payment was sharply limited. Accordingly, Mr. Levatino informed Roman Crest's attorney of his desire for a supplemental payment and the attorney refused to have anything to do with the transaction. He called Slavin to tell him that his approval was not forthcoming and sent the signed documents to him

2. According to Slavin, Levatino resigned his positions and transferred his Roman Crest stock in order to avoid the consequences of a revocation of Roman Crest's license because of possible violation of the Perishable Agricultural Commodities Act. Mr. Slavin explained that at the creditors' meeting in October, 1983, Mr. Levatino's attorney stated that the debtor had been insolvent for two years. In Slavin's opinion, revocation of Roman Crest's license would also bar any officer, director, or shareholder owning more than ten percent of the shares of stock from not only having a license but even being employed by a licensee in any capacity at all, even as a sweeper, for a period of at least one or two years.

with a handwritten cover note stating that his failure to approve was the result of a disagreement between him and Levatino and with a cover letter reciting his failure to approve and purporting to prohibit use of the documents.

The principal reason cited by Roman Crest's attorney for withholding his approval is, however, far from credible. He claimed that he could not approve of the transaction principally because the contract representations and warranties as to the absence of any liens and encumbrances on the Leaseholds were simply not true at that time. He added that he so informed Slavin who unequivocally denies that assertion.

Because in his demeanor, sincerity and command of the facts Slavin is a far more credible witness, his version of this telephone call is worthy of belief. Roman Crest's attorney's purported concern regarding the absence of any liens and encumbrances is fabricated. Under the contract, clear title was only a condition to closing, there being no contractual representation that the property was unencumbered on the date the contract was signed. Although one might believe in good faith that certain liens might prove difficult to satisfy, here Slavin had determined that there would be no difficulty in obtaining satisfactions from all but one or two lienholders and he expected that Roman Crest would be able to satisfy them as well.

Most significantly, these conditions are fairly customary. Indeed, they are contained, word for word, in Roman Crest's subsequent agreement with Tropical Brands. Yet no impediment was found to Roman Crest's entering into that contract.

Furthermore, not until six weeks later, when the parties were gearing up for litigation, do these reasons appear in any document. That the attorney wrote to Levatino on October 18, 1983, listing the warranty and representation of no liens or encumbrances as the reasons for his disapproval shows only that those contractual clauses were seized on as a belated afterthought. On the basis of all the evidence, we find that the failure to approve the contract lies in a disagreement between Levatino and

the attorney, as the attorney's contemporaneous note states, seemingly over Levatino's attempt to obtain an under the table payment. As the attorney also testified, he informed Levatino that this was the wrong thing to do and that Levatino should seek counsel for bankruptcy advice.

Slavin, upon receipt of the documents, on his own accord and without an express escrow agreement by the parties regarding the documents, decided to hold the documents in escrow and failed to record them. For its part, the debtor apparently finally heeded the advice of its lawyer and engaged noted bankruptcy counsel who, at a creditors' meeting convened to obtain consent to the transaction, referred to the principal document signed by both Hunts Point and Roman Crest as a contract. The creditors' agreement was not forthcoming, however, once Tropical Brands offered $200,000, plus relief from a purported $335,000 lien, for the Leaseholds. Thereafter, in October 1983, Roman Crest and Tropical Brands entered into a contract similar in form to the one prepared by Slavin. Prior to the trial, Levatino commenced employment with Tropical Brands.

Having reached agreement with Tropical Brands, Roman Crest apparently requested the New York City Department of Ports and Terminals to grant its permission to assign the Leaseholds to Tropical Brands. Because conflicting demands for approval were being made by Hunts Point and Tropical Brands, a representative of that department informed Slavin that formal consent to the assignment to Hunts Point, which would have been pro forma, would not be forthcoming until she received a court order. This litigation then ensued.

## II.

There being no contest as to the plaintiff's lack of an adequate remedy at law since the contract it asserts concerns real property, the issues identified by the parties at the hearing all pertain to the merits of this action. They can be briefly summarized as follows:

1. Is the Hunts Point/Roman Crest agreement a valid contract?

2. If so, can Roman Crest, given its powers as a debtor-in-possession pursuant to § 1107 of the Code, either avoid the contract pursuant to § 544(a) or, if the contract is executory in nature, reject it, pursuant to § 365(a)?

For the reasons set forth below we hold that although the debtor's acceptance of the contract was conditioned upon the approval of its attorney, the contract was indeed a valid contract and pursuant to § 365(a), the debtor can reject it. Although the debtor's acceptance of the contract, and hence the formation of the contract itself, was conditioned upon the approval of the debtor's attorney, we find that the condition is deemed to have been satisfied and the contract formed since it was Mr. Levatino's breach of his implicit duty of good faith and fair dealing in the performance of this condition that caused debtor's attorney to withhold his approval. Furthermore, the debtor is precluded from avoiding the contract under its § 544(a) powers because (i) Hunts Point's status as a vendee of real property and its vendee's lien are superior in status to the debtor's status as a judicial lien creditor under § 544(a)(1) and (ii) the debtor is deemed to have had constructive notice of Hunts Point's interest in the property which prevents it from acceding to the § 544(a)(3) avoidance powers bestowed upon a bona fide purchaser for value. Because we find that the contract is executory and application of the business judgment rule reveals that it is in the best interest of this estate to reject the contract, we find that the debtor may reject this contract pursuant to its § 365(a) powers. Hunts Point, however, by virtue of subsection (i) of § 365, has a vendee's lien to the extent of its down payment and also has a right to present a claim against the debtor's estate for additional damages, if any, flowing from the debtor's rejection of the contract under § 365(g). Specific performance, therefore, is denied and that portion of its complaint is dismissed. Hunts Point will, however, be able to bid at the auction sale to be held pursuant to the debtor's application to sell the Leaseholds.

### III.

■ The general requisites for formation of a contract entail offer, acceptance and consideration. See Restatement (Second) of Contracts §§ 24, 50, 71 (1981). The debtor, in urging that no contract was reached between it and Hunts Point, seeks to assert a fourth requirement of delivery. It claims that the delivery to Slavin of the executed documents without approval of the terms by Roman Crest's attorney, was tantamount to no delivery and, for that reason, the contract never came into being.

■ This assertion is untenable as a matter of law. Comment (d) to § 95 of the Restatement (Second) of Contracts (1981) affirms only that contracts *under seal* become effective on delivery rather than upon acceptance of an offer and agreement on consideration. As explained in the introductory note to that section, at common law the seal was considered a substitute for consideration. *See also* Restatement (Second) of Contracts § 95 (1981). The requirements applicable to a contract under seal remain pertinent only to a small group of contracts designated as "formal contracts", which include contracts under seal, recognizances, letters of credit, and negotiable instruments and documents. Restatement (Second) of Contracts, § 6 (1981).[3]

---

**3.** The New York cases collected in 21 N.Y. Jur.2d *Contracts* § 15 (1982) and cited by that treatise in support of its conclusion that delivery is a predicate to formation of a contract in New York concern either formal contracts or ignore the distinction between formal and informal contracts. As such, the reasoning of these cases is inapplicable to the case at bar. For formal contracts exception *see Irving Trust v. Leff,* 253 N.Y. 359, 171 N.E. 569 (1930) (negotiable instruments not effective until delivery); *Birch v. McNall,* 19 A.D.2d 850, 244 N.Y. S.2d 60 (4th Dept. 1963) (fact of whether parties intended that transfer of a deed to have occurred without delivery precluded summary judgment); *Ross v. Ross,* 233 App.Div. 626, 253 N.Y.S. 871 (1st Dept.1931), *aff'd* 262 N.Y. 381, 187 N.E. 65, *reh. den.* 262 N.Y. 643, 188 N.E. 102 (1933) (trust is incomplete until delivery of trust instrument and trustee's execution and acceptance thereof, and delivery of trust property); *First National Bank & Trust Co. of Elmira v. Conzo,* 169 Misc. 268, 7 N.Y.S.2d 334 (Chemung Cty. 1938) (a promissory note is a negotiable instrument and is effective upon de-

The Hunts Point/Roman Crest agreement cannot be so categorized.

■ Rather than a requirement of delivery, the facts here demonstrate that Roman Crest's acceptance was conditioned upon its attorney's approval, which was not forthcoming. *See Pym v. Campbell,* 119 Eng. Rep. 903 (Q.B.1856). Notwithstanding the presence of a merger clause in the apparently integrated agreement that would bar the admission of parol evidence in defining the scope of the contract,[4] such evidence is admissible (i) as proof of a collateral contract distinct from and independent of the written agreement and which will not vary or contradict the terms of the contract if admitted[5]; and (ii) parol evidence which demonstrates that a purported written con-

tract is, in fact, no contract at all. *Mitchill v. Lath,* 247 N.Y. 377, 379–381, 160 N.E. 646 (1928); *Jamestown Business College Association v. Allen,* 172 N.Y. 291, 294, 64 N.E. 952 (1902); *Thomas v. Scutt,* 127 N.Y. 133, 137, 27 N.E. 961 (1891).

Thus, in *Pym v. Campbell,* 119 Eng.Rep. 903 (Q.B.1856), where the parties, for convenience, signed a contract to purchase an invention but stipulated that their agreement was conditioned on the approval of an engineer, the court held that there was no contract, stating:

"The distinction in point of law is that evidence to vary the terms of an agreement in writing is not admissible, but evidence to shew that this is not an agreement at all is admissible."

*Pym v. Campbell,* 119 Eng.Rep. 903, 905 (Q.B.1856).[6] As the New York Court of

livery). For early cases or cases ignoring the distinction *see Thomas Nelson & Sons Publishing Co. v. Bonner,* 200 N.Y.S. 341 (1st Dept. 1923); *Morton v. Witte,* 147 A.D. 94, 131 N.Y.S. 777 (2d Dept. 1911); *Day v. Dow,* 46 A.D. 148, 61 N.Y.S. 793 (1st Dept. 1899); *Schwartzreich v. Bauman-Basch,* 105 Misc. 214, 172 N.Y.S. 683 (1st Dept. 1918), aff'd 188 A.D. 960, 176 N.Y.S. 921, aff'd. 231 N.Y. 196, 131 N.E. 887, *reh. den.* 231 N.Y. 602, 132 N.E. 905 (1921). Because the distinction drawn in the Restatement (Second) of Contracts concerning the delivery requirement in separating formal from informal contracts is supported by the above-cited cases, the conclusion reached in 21 N.Y.Jur.2d *Contracts* § 15 (1982) is not accepted as an accurate statement of New York law regarding informal contracts.

**4.** *Lee v. Joseph E. Seagram & Sons, Inc.,* 413 F.Supp. 693, 700 (S.D.N.Y.1976), aff'd. 552 F.2d 447, 450–453 (2d Cir.1977); *Gem Corrugated Box Corp. v. National Kraft Container Corp.,* 427 F.2d 499, 502 (2d Cir.1970); *Fogelson v. Rackfay Construction Co.,* 300 N.Y. 334, 337–338, 90 N.E.2d 881 (1950); *Mitchill v. Lath,* 247 N.Y. 377, 379, 247 N.Y. 377 (1928); *Thomas v. Scutt,* 127 N.Y. 133, 137, 27 N.E. 961 (1891); *Eighmie v. Taylor,* 98 N.Y. 288, 294 (1885); Restatement (Second) of Contracts § 213, comment a (1981).

**5.** The classic definition of this exception was provided by Judge Andrews in *Mitchill v. Lath,* 247 N.Y. 377, 380–381, 160 N.E. 646 (1928):
Under our decisions, before such an oral agreement as the present is received to vary the written contract at least three conditions must exist, (1) the agreement must in form be a collateral one; (2) it must not contradict express or implied provisions of the written contract; (3) it must be one that parties

would not ordinarily be expected to embody in the writing; or put another way, an inspection of the written contract, read in the light of surrounding circumstances must not indicate that the writing appears "to contain the engagements of the parties, and to define the object and measure the extent of such engagement." Or again, it must not be so clearly connected with the principal transaction as to be part and parcel of it.

**6.** This rationale has been criticized. *See* Restatement (Second) of Contracts, § 217, comment b, illustration 1 (1981). There it is argued that if the parties orally agree that performance of a written agreement is subject to a condition precedent, there will be a binding contract created immediately, but that the parties' duties of performance are dependent upon the occurrence of the condition. Furthermore, the Second Restatement views the existence of a condition as a question of integration, *i.e.,* either the writing is not an integrated agreement or the agreement is only partially integrated until the condition occurs, regardless of the fact that the writing contains a merger clause. *Id.*

Nevertheless, it remains good law in New York. *Bloor v. Shapiro,* 32 B.R. 993, 999 n. 6 (D.C.S.D.N.Y.1983); *Woodmere Academy v. Steinberg,* 41 N.Y.2d 746, 395 N.Y.S.2d 434, 363 N.E.2d 1169 (1977); *Hicks v. Bush,* 10 N.Y.2d 488, 225 N.Y.S.2d 34, 180 N.E.2d 425 (1962); *Smith v. Dotterweich,* 200 N.Y. 299, 305, 307, 93 N.E. 985 (1911); *Jamestown Business College Association v. Allen,* 172 N.Y. 291, 294 (1902); *First Newport Realty Investors v. Greenfield,* 86 App.Div.2d 521, 447 N.Y.S.2d 673 (1st Dept.1982); *Tropical Leasing v. Fiermonte Chevrolet,* 80 App.Div.2d 467, 439 N.Y. S.2d 566 (4th Dept.1981); *Zugarek v. Walck,* 54 A.D.2d 1074, 388 N.Y.S.2d 756 (4th Dept.

Appeals ruled in *Hicks v. Bush,* 10 N.Y.2d 488, 491, 225 N.Y.S.2d 34, 180 N.E.2d 425 (1962), although the admission of parol testimony to prove a condition precedent to the legal effectiveness of a written agreement inherently affects all of the written terms of that agreement thereby seemingly violating the parol evidence rule, it is only those parol agreements which in a real sense contradict the express terms of such agreement that violate the spirit of the rule and are therefore prohibited.

■ But finding a cognizable unperformed condition is only the beginning of analysis, not the end. Implicit in every contract are the parties' duties of good faith and fair dealing. Restatement (Second) of Contracts, § 205 (1981). When a contractual duty is conditional, good faith and fair dealing require the promisor reasonably to cooperate by either refraining from conduct which would prevent or hinder the occurrence of the condition, or by taking positive action to cause its occurrence. *Lach v. Cahill,* 138 Conn. 418, 85 A.2d 481, 482 (1951); J. Murray, *Murray on Contracts,* § 187 (2d ed. 1974); *see also Van Iderstine Co., Inc. v. Barnet Leather Co., Inc.,* 242 N.Y. 425, 432, 152 N.E. 250 (1926). Failure to do so requires that the condition be deemed satisfied and the contract found to be in existence. J. Murray, *Murray on Contracts,* § 187 (2d ed. 1974). Restatement (Second) of Contracts, § 225 comment (b) (1981).

■ On this record of Levatino's attempt to procure a personal under-the-table payment as a reward for committing Roman Crest to sell the Leaseholds to Hunts Point, it is apparent, even construing the evidence in favor of the debtor, that Levatino thus caused the failure of the condition. Slavin's and Hunts Point's manifest desire for unhampered review by Roman Crest's attorney could not have contemplated Levatino's attempt to draw counsel into his attempted side arrangement and counsel's concomitant refusal to have anything to do with either transaction. Good faith and fair dealing

were hardly present even under the debtor's view of the facts here.

The evidence, moreover, goes further. The attorney's attempt to build a record of his purported reasons for refusing to approve the contract, the lack of substance underlying those reasons, the similarity between the conditions to the Hunts Point and Tropical Brands contracts, and his note to Slavin are at least circumstantial evidence that the attorney permitted himself to be used as a foil for Levatino's desires to receive personal compensation. Based on all of these factors plus the fallaciousness of the reasons offered to justify his failure to approve the contract, we so find. Good faith and fair dealing are hardly present when an attorney fails to approve a contract so that the person running the day-to-day affairs of his client can leverage his demand for an under the table payment. Under either view of the facts, it is apparent that the condition of approval is to be deemed satisfied and the contract is deemed to have been formed. *See J. Murray, Murray on Contracts,* § 187 (2d ed. 1974).

## IV.

Having concluded that the Hunts Point/Roman Crest agreement was a valid contract, we now turn to consider whether it can be avoided as provided in § 544(a) or rejected pursuant to § 365 of the Code. In essence, the debtor's claim that it can avoid or reject the contract is asserted as a defense to the plaintiff's demand for specific performance. It would make no sense to order the debtor to specifically perform a contract that can be avoided or rejected.

## A.

■ Section 544(a) of the Code clothes the trustee with the mantle of a hypothetical judicial lien creditor, unsatisfied execution creditor, and a bona fide purchase for value as of the date of the filing of the bankruptcy petition. While it is federal

---

1976); *Procopis v. G.P.P. Restaurants,* 43 A.D.2d 974, 352 N.Y.S.2d 230 (2d Dept.1974); *Warshaw v. Hassid,* 41 A.D.2d 652, 340 N.Y. S.2d 666 (2d Dept.1973); *Cuddy v. Universal*

*Consolidated Industries,* 38 A.D.2d 971, 331 N.Y.S.2d 790 (2d Dept.1972); *Spina v. Ferentino,* 30 A.D.2d 1035, 294 N.Y.S.2d 721 (4th Dept.1968).

law which provides the trustee with his "strong arm" powers, his exercise of those powers is controlled by the substantive law of the jurisdiction governing the property in question; here, the law of New York. *In re Euro-Swiss International Corp.,* 33 B.R. 872, 11 B.C.D. 113, 116 (Bkrtcy.S.D.N.Y. 1983). In New York, a purchaser of land upon execution of a contract and partial payment of the purchase price, "becomes equitable owner pro tanto of the subject property and enjoys an equitable lien thereon." *Sloan v. Pinafore Homes, Inc.,* 38 A.D.2d 718, 329 N.Y.S.2d 420, 422 (2d Dept. 1972). Here Hunts Point acquired that status. That its down payment was held in escrow pursuant to the contract does not deprive it of its claim to the property. Moreover, its failure to record the contract entitling it to that status does not subject the contract to the power the debtor has in its status as a hypothetical judicial lien creditor. While the recording of an executory contract for the sale of real property gives constructive notice to subsequent purchasers of a third party's interest, N.Y. Real Prop.L. § 294 (McKinney 1978); *La Marche v. Rosenblum,* 82 Misc.2d 1046, 371 N.Y.S.2d 843 *aff'd.* 50 App.Div.2d 636, 374 N.Y.S.2d 443 (1975), the recording act on its face and as interpreted by New York case law, is designed to protect subsequent purchasers and not judicial lien creditors. *In re Euro-Swiss International Corp., supra,* 33 B.R. 872, 11 B.C.D. at 117. The failure of Hunts Point to record its contract has no adverse effect, therefore, on the status of its vendee's lien vis-a-vis Roman Crest's § 544(a)(1) judicial lien. *See Ledsal Realty Corp. v. Demkin,* 141 N.Y.S.2d 686, 690 (S.Ct. Suffolk Cty. 1955); *see also Engel v. Tinker National Bank,* 269 F.Supp. 199, 203 (E.D.N.Y.1967). Since Hunts Point's lien dates from September 12, 1983, when Roman Crest's attorney wrongfully failed to give his approval, its lien is superior to all subsequent liens, including that of Roman Crest pursuant to § 544(a). *Ledsal Realty Corp. v. Demkin,* 141 N.Y.S.2d 686, 690 (S.Ct. Suffolk Cty. 1955); *see Engel v. Tinker National Bank,* 269 F.Supp. 199, 203 (E.D.N.Y.1967). After September 12, 1983, only a bona fide purchaser for value could

acquire rights in the property superior to Hunts Point's vendee's lien. *Ledsal Realty Corp. v. Demkin,* 141 N.Y.S.2d 686, 690, *see Engel v. Tinker National Bank,* 269 F.Supp. 199, 203 (E.D.N.Y.1967).

 But the Code's grant of bona fide purchaser status to a debtor-in-possession pursuant to § 544(a)(3) is similarly conditioned on state substantive law defining the notice to which a bona fide purchaser is subject. *McCannon v. Marston,* 679 F.2d 13, 16–17 (3rd Cir.1982); *In re Euro-Swiss International Corp., supra,* 33 B.R. 872, 11 B.C.D. at 117. In New York, constructive notice sufficient to bar a purchaser from avoiding an unrecorded interest as a bona fide purchaser emanates from (i) a reasonable inquiry of those in actual possession, *see Wardell v. Older,* 70 A.D.2d 1008, 418 N.Y.S.2d 196 (1979), or (ii) a reasonable inquiry on the basis of all the circumstances. *E.g., In re Hardway,* 31 B.R. 322, 10 B.C.D. 1063, 1068 (Bkrtcy.S.D.N.Y.1983).

 Here, Hunts Point discovered, through inquiry of the New York City Department of Ports and Terminals, that there was an agreement between Tropical Brands and Roman Crest. It is thus apparent that a bona fide purchaser seeking to obtain the same requisite consent would have learned of the Hunts Point/Roman Crest agreement. Whether such knowledge, in and of itself, was enough to put Tropical Brands on notice of Hunts Point's status as a vendee we need not decide; it was clearly of sufficient magnitude to require a hypothetical purchaser to inquire further as to any rights Hunts Point may have had in the property. *See e.g., In re Euro-Swiss International Corp., supra,* 33 B.R. 872, 11 B.C.D. at 117; *In re Fitzpatrick,* 29 B.R. 701, 10 B.C.D. 782 (Bkrtcy.W.D.Wis.1983). Consequently, Hunts Point's equitable lien and status may not be avoided.

### B.

 None of this is to say that the contract cannot be rejected pursuant to § 365 of the Code. Inquiry under that section is directed to the different considera-

tions articulated by Professor Vern Countryman in his seminal law review article defining an executory contract as

[a] contract under which the obligation of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach...

Countryman, *Executory Contracts in Bankruptcy: Part I*, 57 Minn.L.Rev. 439, 460 (1973); *accord*, 2 *Collier on Bankruptcy*, ¶ 365.02 (15th ed. 1983).

Notwithstanding the Congressional acceptance of this test as reflected in the legislative history of the Code, H.Rep. No. 95–595, 95th Cong. 1st Sess. 347 (1977); S.Rep. No. 95–989, 95th Cong., 2d Sess. 58 (1978), U.S.Code Cong. & Admin.News 1978, p. 5787, at least one court has subsequently concluded that this test gives way in Chapter 11 to an examination of the contract in light of the rehabilitative purpose of that Chapter and the desire to enlarge the benefit to creditors. *In re Booth*, 19 B.R. 53 (Bkrtcy.D.Utah 1982); *cf. In re Jolly*, 574 F.2d 349 (6th Cir.1978), *cert. denied*, 439 U.S. 929, 99 S.Ct. 316, 58 L.Ed.2d 322 (1978); *In re Gladding*, 22 B.R. 632, 634 (Bkrtcy.D.Mass.1982). However questionable such analysis might be given its variance from the canons of statutory construction requiring examination of the express language of the statute as opposed to what Congress could have or should have done, there is no need to address that gloss here.[7] The commentators agree that a contract to sell real property is executory where the deed has not been delivered and the purchase price not paid in full. *See* authorities collected in *In re Booth*, 19 B.R. at 54 n. 3.

The instant case does not posit exactly that situation. The contract may, nevertheless, be rejected. Here, the parties contracted to sell the Leaseholds subject to the consent of the New York City Department of Ports and Terminals and the debtor executed and delivered to Slavin a bill of sale and assignment. The City had given its oral consent to the assignment and had affirmed that its written consent was pro forma. All that remained for the debtor to do at closing, upon securing that written consent and receiving the purchase price, was to satisfy its warranty and representation of no liens and encumbrances and to turn over possession of the property to the plaintiff. Had it failed to do so, however, it would have breached the agreement. All that remained for the purchaser to do was to release the down payment from escrow, to pay the remainder of the purchase price and to post a security deposit with the City. But had it failed to do so, it would be in breach.

As such, this situation is not, in practical terms, significantly different from that addressed in *In re Swindle*, 188 F.Supp. 601 (D.Or.1960). There, the court found executory a contract to sell realty where the debtor had delivered a deed in escrow conditional upon receipt of the purchase price and shortly thereafter filed a petition in bankruptcy and was adjudicated a bankrupt. Although the court did not indicate whether the debtor remained in possession or had a further obligation such as to deliver marketable title or that the premises be delivered in a promised condition, the contract was held executory. Presumably, it could still be breached by the debtor. The same is true here.

Moreover, the parties do not seriously dispute the debtor's ability to reject the Hunts Point/Roman Crest contract were it concluded that the contract is executory. That lack of dispute stems apparently from the recognition that the debtor's power to reject, although derived from the doctrine that the estate may abandon burdensome property, 2 *Collier on Bankruptcy* ¶ 365.-

---

7. In *In re Booth*, 19 B.R. 53 at 57 (D.Utah 1982) the court amplified its holding by stating that "[u]nder the Code, and Section 365, the exceptions virtually swallow the Countryman rule" and lists various examples, such as personal service contracts and agreements to issue securities that the Code, following prior holdings, deems not assumable. That Congress expressly carved out exceptions, however, proves the applicability of the general rule. No such gloss has been adopted by this Court. *See In re E.C. Ernst, Inc.*, 24 B.R. 192, 195 (Bkrtcy.S.D.N.Y. 1982); *In re Barney Schogel, Inc.*, 12 B.R. 697, 721 (Bkrtcy.S.D.N.Y.1981).

01[1] (15th ed. 1983) is to be tested by the "business judgment" standard first enunciated in *Group of Institutional Investors v. Chicago, Milwaukee, St. Paul and Pacific R. Co.,* 318 U.S. 523, 549–550, 63 S.Ct. 727, 742–743, 87 L.Ed. 959 (1943). *Control Data Corp. v. Zelman,* 602 F.2d 38, 43 (2d Cir. 1979); *In re Tilco,* 558 F.2d 1369, 1372 (10th Cir.1977); *King v. Baer,* 482 F.2d 552, 557–558 (10th Cir.1973), *cert. denied,* 414 U.S. 1068, 94 S.Ct. 577, 38 L.Ed.2d 473 (1973). Under this principle, a finding that a contract is burdensome or that it does not cause a net loss to the estate is not controlling; rather, these are just some of the factors that a court considers.[8]

Here the debtor and the official creditors' committee have concluded that the offer by Tropical Brands so far exceeds the consideration to be received under the Hunts Point/Roman Crest contract that the benefit to the debtor commands its rejection.

We are constrained to agree, particularly since § 365 of the Code grants Hunts Point the protection of a vendee's lien of the Code to the extent of its down payment and § 365(g) vests it with the right to present a claim against the debtor's estate for additional damages, if any, flowing from the debtor's rejection of the contract. Furthermore, Hunts Point will be able to bid at the auction sale to be held pursuant to the debtor's application to sell the Leaseholds. Specific performance may not be ordered where the contract is rejected. That portion of the plaintiff's complaint must be dismissed.

The foregoing constitutes this Court's findings of fact and conclusions of law pursuant to Rule 7052 of the Rules of Bankruptcy Procedure. Settle order on personal notice.

**8.** While one commentator states that contracts for the sale of real property are an area of executory contract law where judicial concern for innocent third parties, *e.g.,* the vendee, has led to a fairly strict application of a requirement that the contract be shown to be burdensome, 2 *Collier on Bankruptcy,* ¶ 365.10 (15th ed. 1983), that assessment is based on concerns

that pre-date the Code. Congress responded to them by granting to a party to a rejected executory contract to purchase real property, who is not in possession, a lien on the interest of the debtor in the property for recovery of any portion of the purchase price. 2 *Collier on Bankruptcy* ¶ 369.10[1].