## In the Matter of BERNHARD ALTMANN INTERNATIONAL CORPORATION, Debtor.

United States District Court
S. D. New York.
Oct. 8, 1963.

Ballon, Stoll, Shyman & Levine, New York City, for debtor-in-possession.

Frank G. Wittenberg, New York City, for Oesterreichisches Credit Institut Aktiengesellschaft.

Benedict Ginsberg, New York City, for J. J. O'Donnell High Rock Mills, Inc.; Sydney Krause, New York City, of counsel.

Hahn, Hessen, Margolis & Ryan, New York City, for Aaron Furman; J. Jacob Hahn, Harry A. Margolis, Julius J. Abeson, New York City.

FREDERICK van PELT BRYAN, District Judge:

Two petitions to review an order of the referee in a proceeding under Chapter XI of the Bankruptcy Act, brought on the same grounds, are before me. The order under review approved and accepted an offer by one Furman to purchase for $225,000, land, buildings and machinery belonging to the debtor-in-possession located at Philmont, New York, and known as the High Rock Plant, free from liens, with all liens to attach to the purchase price, and disapproved an agreement between the mortgagee of such property and a third party to sell the property on similar terms for $200,000.

The debtor-in-possession was engaged in spinning and weaving woolens and knitting wearing apparel. In addition to the High Rock Plant it had a plant in San Antonio, Texas.

The debtor owned the fee of the land and buildings at the High Rock Plant and the machinery and equipment which they contained. One of the petitioners for review, Oesterreichisches Credit Institut Aktiengesellschaft (O.C.I.), an Austrian banking corporation, held a first mortgage on the real property and a chattel mortgage on the machinery and equipment. The mortgage on the real estate secured an indebtedness of $300,000 and the chattel mortgage an indebtedness of $700,000, which included the $300,000. These debts also appeared to have been secured by a mortgage on debtor's San Antonio plant and its equipment. However, the various mortgage documents are not in evidence and the precise nature of the mortgage arrangements is not clear from this record.

On January 7, 1963 the debtor filed a petition for arrangement under Chapter XI, and was authorized as debtor-in-possession to continue to operate and manage its business.[1] The operation at the High Rock Plant was apparently a losing one and a continuing drain on the debtor's resources. For these reasons the debtor discontinued operations there.

Subsequent to the filing of the petition O.C.I. commenced foreclosure proceedings against the High Rock Plant in the New York State Courts. It did not ask for a deficiency judgment. Apparently these proceedings were commenced without the consent of the Bankruptcy Court and were later stayed.

Before progressing with the foreclosure, O.C.I. sought a purchaser for the High Rock Plant in order to satisfy, in part at least, the indebtedness due it. On January 25, 1963 it entered into an agreement with the other petitioner for review, J. J. O'Donnell High Rock Mills, Inc. (O'Donnell), for the sale of the property to O'Donnell free of liens for the sum of $200,000, payable $50,000 in cash with the balance payable in instalments over a period of five years, to be secured by a mortgage of $150,000. It expressly provided that the sale to O'Donnell was subject to the approval of the court. The debtor-in-possession was named as a party to this agreement but was not a signatory to it.

O.C.I. requested the attorneys for the debtor-in-possession to apply to the court for the approval of the agreement providing for the sale to O'Donnell. This application was brought on before the referee by order to show cause returnable on February 18, 1963. The debtor-in-possession applied for approval of the agreement between O.C.I. and O'Donnell "subject to the acceptance of any higher binding offer."

---

1. On May 2, 1963 the Chapter XI proceedings were dismissed and the debtor-in-possession was adjudicated a bankrupt.

On February 8, 1963, pursuant to order of the referee an advertisement of sale was published in the Daily News Record which fixed $200,000 (the price provided in the agreement between O.C.I. and O'Donnell) as an upset price for the property.

The order to show cause was not served on O.C.I. or O'Donnell and neither were aware until the return day of the provision that the sale to O'Donnell was subject to the acceptance of higher offers or of the advertisement of sale. O.C.I. claims that it did not authorize the debtor-in-possession to request that the property be offered to any higher bidders and had no intention of submitting to the referee any question other than the approval or disapproval of the contract between it and O'Donnell, and there is nothing in the record to controvert this claim.

On the return day, in addition to O.C.I. and O'Donnell, the debtor-in-possession, the creditors' committee and Furman, a potential purchaser, prepared to bid for the property, appeared before the referee. Upon learning that other bids were to be considered, O.C.I. and O'Donnell both protested that the only question before the referee was the approval or disapproval of the agreement between them, that the sale to Furman was an invasion of O.C.I.'s rights as mortgagee and that if the referee disapproved the agreement, O.C.I. should be permitted to proceed with foreclosure in the state courts.

The attorneys for the creditors' committee, the debtor-in-possession, and the bidder Furman, however, contended that O.C.I., by submitting its contract with O'Donnell to the court for approval, had consented to a sale before the referee to the highest bidder free of liens, and the referee was therefore empowered to proceed.

There were extended hearings before the referee which were continued on March 4 and March 11, 1963. Testimony was taken which consisted in the main of expressions of opinion by the various lawyers as to what the rights of their respective clients were. Twice during the course of the hearing O.C.I. offered to waive an additional $100,000 of its secured debt if the sale to O'Donnell were approved, to put "the general creditors in the same position as if the result of the sale of the real estate would be $300,-000." The hearings generated a good deal of heat but threw little, if any, light on the problem before the referee.

At the final hearing on March 11 Furman bid $225,000 for the High Rock Plant free and clear of liens, payable all in cash on the closing. O'Donnell refused to make a further bid and did not increase its original figure of $200,-000 payable partly in instalments. No other bids were made. The Furman bid was thereupon accepted by the referee and the proposed sale to O'Donnell pursuant to its agreement with O.C.I. of January 25, 1963, was disapproved. All this was over the continuing vigorous objections of O.C.I. and O'Donnell.

Thereafter the referee made findings of fact and conclusions of law. There was no finding, however, as to the value of the property covered by the mortgages either at Philmont or at San Antonio, the amount of the indebtedness secured, or as to whether there was likelihood of any equity in the mortgaged properties for the estate over the amount secured by the mortgage liens. The findings of fact recited merely that the debtor had title to and possession of the High Rock Plant which was subject to undescribed real property and chattel mortgages held by O.C.I.; that O.C.I. and O'Donnell had entered into the agreement of January 25, 1963 for the sale to O'Donnell of the High Rock Plant free of liens and subject to court approval; that the debtor-in-possession had applied to sell the plant pursuant to such agreement or pursuant to the terms of any higher offer for the property; that there had been due notice and hearing; that O.C.I. and O'Donnell had objected to the receipt of other bids and that the bid of Furman of $225,000 for the plant free and clear of liens had been accepted and the proposed sale to O'Donnell disapproved and rejected.

On the basis of these findings of fact the referee concluded that (1) "The provision in the agreement of January 25, 1963, that the proposed sale to O'Donnell was to be subject to the approval of the court, required the court to impose the condition that higher bids be invited and considered"; (2) "The court had no authority to sell the plant at a private sale. It was the duty of the court, pursuant to general orders, this court's Bankruptcy Rules and the Bankruptcy Act, to offer the plant for sale at a public sale, in the absence of special circumstances, which were not present here;" (3) "Since O'Donnell and O.C.I. were dealing with the property of the debtor-in-possession, they were put on notice that their proposed sale, pursuant to the agreement of January 25, 1963, could not be a private sale." The referee therefore concluded that the sale of the plant to Furman, the highest bidder, should be confirmed and the proposed sale to O'Donnell should be disapproved and rejected.

The order under review was then entered providing for the acceptance of the Furman offer and the disapproval and rejection of the O.C.I.-O'Donnell agreement, directing the debtor-in-possession to transfer title and possession of the property to Furman free and clear of liens upon payment of $225,000 in cash to be deposited in a special account with all liens to attach to the sums so paid. It also directed the debtor-in-possession, Furman and O.C.I. to attend the closing of title "pursuant to the provisions of the contract of January 25, 1963," and "to execute and deliver" at such closing "such documents as may be necessary to complete the sale."

The petitioner for review, while not questioning the power of the referee to approve or disapprove the proposed sale to O'Donnell, asserts that the only question presented to the referee was the approval or disapproval of the O.C.I.-O'Donnell agreement; that by the submission of that question to the referee O.C.I. did not waive its rights as mortgagee or consent to a sale at auction by the Bankruptcy Court to the highest bidder free and clear of liens; that the referee was in error in making such a sale absent a demonstrated equity for the estate as a result, and that the sale to Furman was an unwarranted invasion of O.C.I.'s rights as mortgagee and should be set aside.

■■■ Under § 70 of the Bankruptcy Act, 11 U.S.C. § 110, a trustee in bankruptcy (or the debtor-in-possession in an equivalent position) is vested only with the bankrupt's title to property. Where property is subject to a mortgage or other lien the trustee takes only the bankrupt's equity subject to outstanding encumbrances. The validity of pre-existing liens is not affected by the bankruptcy (Bankruptcy Act, §§ 67, 70, 11 U.S.C. §§ 107, 110), and unless restrained by the Bankruptcy Court the lienor may pursue whatever remedy he chooses to enforce his lien. In re North Star Ice & Coal Company, 252 F. 301, 303 (E.D. Tenn.1918).

■■ Nevertheless the Bankruptcy Court has the power to determine the manner in which liens against property of the bankrupt coming into its hands may be enforced in order to protect whatever equity there may be for the general creditors and may sell the property either free or clear of liens or subject to them. Van Huffel v. Harkelrode, 284 U.S. 225, 52 S.Ct. 115, 76 L.Ed. 256 (1931).

But while such power exists in the jurisdictional sense, it must be exercised with discretion and only where justified by the circumstances. It cannot be arbitrarily exercised in the interest of the debtor or his other creditors to the prejudice of the lienor's rights.

■■ Thus it is settled practice not to order a sale free of liens if it appears that the amount of the encumbrance exceeds the value of the property. There should be a fair prospect that such a sale would bring in sufficient at least to discharge the lien if not to produce a surplus available to the general creditors. Louisville Joint Stock Land Bank v. Radford, 295 U.S. 555, 584, 55 S.Ct. 854, 79 L.Ed. 1593

(1935); In re Raymond Service, Inc., 184 F.Supp. 200, 202 (E.D.N.Y.1960); In re Miller, 95 F.2d 441, 442 (7 Cir. 1938); Federal Land Bank v. Kurtz, 70 F.2d 46 (4 Cir. 1934); In re Franklin Brewing Co., 249 F. 333 (2 Cir. 1918); 4 Collier on Bankruptcy (14th ed.) ¶¶70.97(2), 70.99(1). In such a case there is no equity for the general estate and in practical essence the assets belong to the secured creditors. The Bankruptcy Court should not attempt to administer such assets and the secured creditors should be free to pursue the remedies of their choice. In re Miller, supra; Federal Land Bank v. Kurtz, supra; In re Franklin Brewing Co., supra; In re Hagin, 21 F.2d 434, 438 (E.D.La.1927); 4 Collier on Bankruptcy (14th ed.) p. 1849.

■ There are some other special circumstances in which the discretionary power to sell free and clear of liens may also be properly exercised. Thus where the validity of the lien is challenged it may be necessary to sell free and clear of liens in order to preserve the value of the res pending the ultimate determination of that question for the benefit of whichever party is entitled to the proceeds. And where liened property is an integral part of a larger unit, it may be appropriate to sell the whole with the lien attaching to the proceeds rather than to destroy inherent values by piecemeal sale.

Thus the respective interests of the general creditors and of the lienors must be carefully weighed and the Bankruptcy Court must exercise a wise discretion under all the circumstances to see that no violence is done to the rights of either and the best interests of the estate are served.

■ In the case at bar the referee did not exercise his discretion. Instead he concluded that he was "required" "to impose a condition that higher bids be invited and considered"; that "he had no authority to sell the plant at private sale"; and that it was his duty to offer it for public sale "in the absence of special circumstances not present here." He held that O.C.I. and O'Donnell were on notice in dealing with the property of the debtor-in-possession that a private sale could not be held, and that "Furman and the debtor-in-possession were entitled to an order confirming the sale to Furman," free and clear of liens.

The referee made no findings as to the value of the High Rock Plant which was being sold or of the San Antonio Plant which also stood as security for the debt secured by the mortgagee's liens. There was no attempt to ascertain whether there was any equity for the general creditors over and above the mortgage liens in either or both of these properties. The referee did not go into the question of what, if any, deficiency would be provable as a claim against the general estate if a sale was made and the effect such deficiency might have on the interests of the general creditors, nor into any special circumstances which may have existed. In short, the referee proceeded on the theory that he was bound as a matter of law to confirm a sale to Furman free and clear of liens and that he had no discretion in the matter whatsoever.

In this the referee was in error.

■ Plainly O.C.I. could not sell property belonging to the debtor-in-possession and in the custody of the Bankruptcy Court without the approval of the court. Therefore its agreement with O'Donnell was expressly made subject to such approval. By requesting the Bankruptcy Court to approve a sale to O'Donnell by the debtor-in-possession free and clear of liens, O.C.I. necessarily elected to invoke the jurisdiction of the Bankruptcy Court with respect to the liened property and in effect consented to the appropriate liquidation of its security under the court's aegis.

But this did not mean that O.C.I. waived all of its rights as mortgagee or that the court was compelled as a matter of law to sell the property to any higher bidder. The Bankruptcy Court was required to ascertain the facts as to the value of the property to be sold and the value of all the security held by the lienor so as to determine the respective in-

terests of the lienor and the general creditors in the security, whether the estate had any equity in it and whether there might be provable claims for a deficiency which might affect the rights of the general creditors. Any other circumstances bearing on the question of the relative interests of the lienor and the general creditors, or the advantages or disadvantages to either or both of the proposed methods of disposition, should have been considered also.

It was only then that the referee could exercise his sound discretion to determine whether the proposed sale by O.C.I. to O'Donnell, coupled with the waiver of deficiency conditioned upon sale to O'Donnell, which O.C.I. offered at the hearing, or a public sale, furnished adequate protection to the rights of the mortgagee and was in the best interests of the bankrupt estate. He was not bound to approve either of such sales unless he found that these conditions had been satisfied.

■ Moreover, even had the rights of a lienholder not been involved, a public sale by auction of property of the bankrupt is not an absolute requirement. General Order in Bankruptcy 18(2) clearly contemplates private sales for good cause shown and Rule 13(c) of the Bankruptcy Rules of this court similarly permit sales other than at public auction where there are "special circumstances". The determination as to whether to hold a public or private sale is always in the sound discretion of the Bankruptcy Court. See In re Paper Corporation of America, 138 F.Supp. 29 (S.D.N.Y.1956).

The case at bar is quite distinguishable from In re Freehill v. Greenfeld, 204 F.2d 907 (2 Cir. 1953) which respondents contend establishes that the lienor here consented to a public sale free and clear of liens. That case, unlike the case at bar, did not involve the rights of lienors but simply reaffirmed the rule that a contract for the sale of property belonging to the bankrupt, although subject to the approval of the court, was nevertheless binding on the offeror who could not withdraw his offer merely because a public sale was held. It is not apposite here.

Nor are the other cases which respondents rely on for the same proposition in point, such as In re Miller, supra; In re Karolevitz, 130 F.Supp. 24, 25 (D.C. Minn.1955); In re Estes, 2 F.Supp. 576 (W.D.S.C.1921); T. E. Wells & Co. v. Sharp, 208 F. 393, 396 (8 Cir. 1913); In re Boyer, 130 F.Supp. 20, 23 (D.C. Minn.1955); In re Los Angeles Lumber Products Co., 24 F.Supp. 501, 514 (S.D. Cal.), aff'd 100 F.2d 963 (9 Cir.), rev'd on other grounds Case v. Los Angeles Lumber Prod. Co., 308 U.S. 106, 60 S.Ct. 1, 84 L.Ed. 110 (1939). In such cases, while it was apparent that there was no equity for the estate, the lienors either directly petitioned for public sale under the auspices of the Bankruptcy Court or had knowledge of such sale and failed to raise any objection to it. Here, in contrast, the lienor constantly objected to the public sale free and clear of liens and insisted on its special position.

In view of the failure of the referee to make any findings on which his discretion might be exercised and to exercise any discretion, it must be concluded that there was no warrant for the confirmation of the sale to Furman. The order of the referee will be set aside and the case remanded to the referee for further proceedings consistent with this opinion.

Upon exploration of the questions which have been indicated, and upon appropriate findings of fact, the referee, in the exercise of his discretion may then determine whether the proposed sale to O'Donnell should be approved or disapproved, whether a public sale of the High Rock Plant is warranted, or whether the interests of the lienor or of the general creditors, or both, require some other disposition of the property. If he should determine that a public sale should be held, O.C.I., O'Donnell and Furman should have the opportunity to make further bids if they desire.

It is so ordered.