**In re BEKER INDUSTRIES CORP., and Beker Phosphate Corporation, Debtors.**

**Bankruptcy No. 85 B 11709–10.**

United States Bankruptcy Court, S.D. New York.

Sept. 22, 1986.

Kronish, Lieb, Weiner & Hellman by William J. Rochelle, III, Karen M. Klein and Lisa M. Solomon, New York City, for debtors-in-possession.

Rosenman, Colin, Freund, Lewis & Cohen by Joel W. Sternman, Paul L. Bindler, Arthur S. Linker and Linda Brower, New York City, for Official Committee of Debentureholders.

Stroock & Stroock & Lavan by Lawrence Handelsman and Bonnie J. Schindel, New York City, for Official Committee of Unsecured Creditors.

Bishop, Liberman & Cook by Robert Miller and Arlene Koval, New York City, for Official Committee of Equity Holders.

Dewey, Ballantine, Bushby, Palmer & Wood by Martin Domb, New York City, for Western Co-op. Fertilizers (U.S.) Inc.

Wachtell, Lipton, Rosen & Katz by Scott Charles, New York City, for First Nat. Bank of Boston.

Breed, Abbott & Morgan, by Abner T. Zelman, New York City, for Marine Midland Bank as Indenture Trustee.

Weil, Gotshal & Manges by Robbie Narcisse, New York City, for Nat. Bank of Canada and Commercial Credit Business Loans, Inc.

DECISION & ORDER

HOWARD C. BUSCHMAN, III, Bankruptcy Judge.

Beker Industries Corp. ("Beker" or the "Debtor") seeks, by motion dated July 14,

1986, to dispose of certain assets by sale pursuant to § 363(b)(1) and (f) of the Bankruptcy Code, 11 U.S.C. § 363(b)(1), (f) (1984) (the "Code") or, in the alternative, by abandonment pursuant to § 554 of the Code, 11 U.S.C. § 554. These assets consist of a phosphate fertilizer manufacturing facility located in Conda, Idaho (the "Conda Plant"), together with Beker's 50% interest in a partnership with Western Co-operative Fertilizers (U.S.) Inc. ("WCFL") owning and operating a phosphate mine that supplies the basic raw materials for use at the Conda Plant (the Conda Plant and Partnership interest are jointly referred to as the "Conda Assets"). The motion is supported by the official committees representing unsecured creditors and stockholders.

The Official Committee of Debentureholders (the "Committee"), representing the holders of Beker 15⅞% Secured Subordinated Sinking Fund Debentures, issued in the principal amount of $65 million and due July 1, 2003 (the "Debentureholders"), and the Indenture Trustee object particularly to sale and, less strenuously, to abandonment by Beker. The Debentureholders' lien on the Conda Assets secures principal and interest in the amount of some $72 million. It is subordinate to the $10 million lien of National Bank of Canada, Commercial Credit Business Loans, Inc., First National Bank of Boston and Congress Financial Corporation (the "Banks"), as provided in an Order of this Court dated March 6, 1986. That order authorized the $10 million priming of the Debentureholders' lien under § 364(d) of the Bankruptcy Code in connection with a financing agreement between Beker and the Banks as approved by the Court (the "Financing Agreement"). *In re Beker Industries Corp. et al.*, 58 B.R. 725 (Bankr.S.D.N.Y.1986). The Banks do not object to sale of the Conda Assets but do, however, oppose abandonment.

An evidentiary hearing was held on August 11–12, 1986. Prior to the hearing, this Court held that a debtor-in-possession was not barred, as a matter of law, from selling property for less than the amount owed to a secured creditor whose debt is collateralized by the property and could do so if it were established that the price was the highest that could be reached under the circumstances of the case and if special circumstances were established. *See In re Beker Industries, Corp. et al.*, 63 B.R. 474 (Bankr.S.D.N.Y.1986). Familiarity with that decision and with this Court's decision of March 4, 1986, 58 B.R. 725, is assumed.

## I.

Beker manufactures and sells phosphate fertilizer products including diammonium phosphate ("DAP") and phosphoric acid. Its principal assets include the Conda Assets and a plant at Taft, Louisiana (the "Taft Plant"). Other assets include a closed plant at Carlsbad, New Mexico, an office building in Greenwich, Connecticut and foreign subsidiaries doing business in Italy and Brazil. A sale of the Debtor's closed plant at Marseilles, Illinois has recently been authorized by this Court. A subsidiary owns a phosphate mine at Wingate Creek, Manatee County, Florida which supplies rock to the Taft Plant (the mine at Wingate Creek and the Taft Plant are referred to as the "Gulf Coast" operations).

When this Court, in March 1986, authorized the Financing Agreement, Beker's 1986 Business Plan contemplated the continuous operation of the Conda and Gulf Coast operations. It asserted that the financing would benefit the Conda Assets by enabling Beker to keep the Conda Plant running and maintained.[1] The Financing Agreement expires by its terms on January 31, 1987.

1. On the instant motion, there is evidence that one bank, National Bank of Canada, during the negotiation of the Financing Agreement, understood from Beker's then president that Beker would sell the Conda Assets if the Financing Agreement was approved (Mino Dep. at 15–17, Exhibit E at 2). This evidence is contrary to the Debtor's position before this Court when urging approval of the Financing Agreement in February 1986. It then asserted that its business plan would enable the Conda Plant to function if the Financing Agreement were approved and that disapproval could lead to its abandonment.

After financing was obtained, the Conda Plant's operating rate increased, but only to approximately 50% of capacity due to market conditions. February and March were unseasonably warm in the West causing the fields to dry out (Tr. at 89).[2] These weather conditions led farmers to apply fertilizer prior to shipments by the Conda Plant and to make increased orders from the Conda Plant for later spring planting (Tr. at 89). With the return of rain, snow and cold weather in April (Tr. at 40-41, 90), many orders were placed on hold and later cancelled (Tr. at 41, 90-92). Inventory was consequently stockpiled (Tr. at 41). Beker determined that it could not feasibly continue its manufacturing operations at the Conda Plant. It further reasoned that continued operations at Conda would cause the Debtor to exhaust completely its available operating capital under its existing line of credit and thereby force the entire company to cease operations (Tr. at 26-27, 44-47). Accordingly, Beker announced on May 19, 1986 that it was terminating its manufacturing operations at the Conda Plant and would seek immediately to sell the Conda Assets. It also discontinued paying costs of the Conda Partnership (Tr. at 26). *See In re Beker Industries Corp. et al.*, 64 B.R. 890 (Bankr.S.D.N.Y. Aug. 5, 1986). Beker has continued to sell existing inventory at the Conda Plant, but has not created any new inventory since operations were ceased in May. Some inventory still remains (Tr. at 49-50, 86-88).

No one contends that Beker has any equity in the Conda Assets. As stated in its motion dated July 14, 1986, Beker seeks permission to sell the Conda Assets free and clear of the senior and junior liens by public auction at a minimum upset price of $21 million subject to downward adjustment at the auction.

The evidence presented at the hearing confirms that this case is at a critical juncture. Not only has the western market for DAP fallen sharply, the current market for DAP produced at the Taft Plant is approximately $4 per short ton less than current cost of production (Tr. at 22-25). The Taft Plant continues to operate profitably only because Beker has yet to complete delivery on contracts with the Government of India and others for the sale of fertilizer at prices exceeding the present cost of production (Tr. at 22-25). These contracts, however, will expire by the end of November. Unless the market price should rise unexpectedly, the Taft Plant will run at a negative margin in December. If Beker's current financing is not extended in whole or in part past its expiration on January 31, 1987, all agree that it is unlikely that Taft could remain in operation for more than two or three additional months (Tr. at 22-30, 249-51).

The Debentureholders observe that the Conda Assets have, in the five years prior to 1986, been more profitable to Beker than Beker's Gulf Coast operations. To them, the Conda Assets are potentially Beker's most valuable asset for a future plan of reorganization (Tr. at 270-76). Beker argues that its Gulf Coast operations, unlike the Conda Assets, will benefit from an improvement in either export prices or domestic prices because the Taft Plant can service both the export and domestic markets. Beker concludes that it must sell the Conda Assets because: (i) the cost of "mothballing" and maintaining the Conda Assets would diminish its operating capital at a time when the company's financial condition is most vulnerable (Tr. at 28-30, 54-56); (ii) there will not be sufficient demand for it to resume manufacturing operations at a profitable level of capacity at the Conda Plant and it is unlikely that a market for finished product will materialize in the near future (Tr. at 47-48, 53-54, 86-93); and (iii) in Beker's judgment, it should not invest any more funds in the Conda Assets (Zaccarelli Deposition at 118-19).

At the hearing, it was established that "mothballing" the Conda Plant would involve disassembling equipment, draining water and acids from equipment and pipes, and either forcing dry air through them or

2. References are to the transcript ("Tr.") dated August 11-12, 1986.

filling them with oil or antifreeze (Tr. at 98). Completion of this process at the Conda Plant will require a one time expenditure of $180,000 (Exhibit C, Tr. at 222). Proper maintenance of the Conda Plant in a mothballed condition will require an additional monthly cost of $89,000–$100,000 (Exhibit C, Tr. at 216, 110–11).[3] A prolonged shutdown of six to nine months would lead to start-up costs of approximately $4.5 million (Exhibit 7, Tr. at 102–03, 168). If mothballing and proper monthly maintenance costs are not incurred, it will cost millions of dollars more to start-up the Conda Plant (Tr. at 99).

It was further established that retention of the Conda Assets will not cause Beker to exceed its $14 million overformula borrowing limit under the Financing Agreement with the Banks regardless of whether monthly costs are in the range noted above or equal the $130,000 per month projected by the Debtor. (Exhibit C, Tr. at 242–43, Zaccarelli Deposition at 118–19, 124). Payment of monthly maintenance costs in the range found above will leave Beker more than $1 million below the borrowing limit available under the Financing Agreement when that agreement expires at the end of January 1987. Beker, therefore, can maintain the Conda Plant in a mothballed condition and continue its operations for one or two months beyond January 1987, when the Financing Agreement expires.

Conversely, the Gulf Coast operations are not threatened by the expenditure of these funds. Even were the costs of mothballing and maintaining Conda not incurred, Beker could not continue to operate Taft beyond February or March 1987 (Tr. at 25–26, 28–30, 249). That conclusion obtains even under the assumptions that: (i) Beker contributes no funds to Conda after August 1986; (ii) current Gulf Coast market prices and costs prevail; (iii) reductions projected in Beker's July 31, 1986 Business Plan (Exhibit 2) for sales, general, and administrative expenses ("SGA") are realized; and (iv) Beker's current financing arrangement is extended (Tr. at 244–49). Carrying the Conda Plant to January 31, 1987 will cause at most minimal detriment to Beker, under these circumstances.

It further appears that retention of Conda, at least until it is determined whether the Banks will continue to provide financing after January 31, 1987, may assist in this reorganization. Historically, the Conda Assets have been more profitable to Beker than Beker's Gulf Coast operations (Tr. at 270–76) and they have "been a net cash generator through some pretty trying times for Beker, until 1985 ..." (Tr. at 270). Although Conda operated at a slight negative gross margin in 1985, it was still "a shining star next to Taft" which posted a loss of over $27 million on a pre-SGA gross margin basis (Exhibit B, Tr. at 276). The extremely low annualized operating rate of domestic facilities producing phosphoric acid is due in part to the depressed export market (Tr. at 283), the depressed farm economy and the weather conditions experienced in 1986. The erratic movement in the cycle caused by a 50% decline in exports in the year ending June 1986 is an aberration states Arthur D. Little, Inc. ("ADL") (Tr. at 283–84). If this aberration corrects itself and Beker's Gulf Coast operations improve, the Conda operations will benefit from the increase in overall demand

3. The Debtor estimates a monthly charge of $130,000 for maintenance. That figure is extravagant. It includes retention of a comprehensive telephone system at a rental of $10,000 per month and a personnel manager for the 10–12 employees needed to perform maintenance (Tr. at 211–12). Arthur D. Little, Inc. estimates a monthly charge of $83,000. That estimate contemplates removal of the telephone system and a computer system and other reductions including the elimination of the personnel and plant managers (Tr. at 211). The Debtor asserts that the manager is a long-term employee who can also perform regular tasks and that retention of stored information in the computer is necessary to reopen the plant (Tr. at 257–60). We agree that retention of the computer is necessary. If the personnel manager is retained to perform non-managerial tasks, then the running of a tight ship would contemplate dismissal of another employee. The monthly cost would be incurred in addition to the mothballing costs in the first month. Thus it would cost between $269,000 and $280,000 for the first month and from $89,000 to $100,000 each month thereafter to mothball and maintain the Conda Plant.

and, according to ADL, are likely to come back even better (Tr. at 284–85).

Since mid-May, Beker has undertaken intensive efforts to sell the Conda Assets as quickly as possible. Contacts and discussions were had with roughly fifty entities in an effort to generate offers for the property. Its business consultant, Kalliste Corporation ("Kalliste"), sent documentation to anywhere from 23–25 of those entities who expressed some level of interest (Tr. at 137, 141). Those contacts included a wide variety of business concerns and individuals, and encompassed entities referred by various sources, including, among others, members of the Debentureholders' Committee, Beker management and Bear Sterns & Co., the investment banking firm which has on prior occasions (including earlier this year) sought to market the Conda Assets (Tr. at 59–60). Of the parties contacted, however, only three or four indicated any interest in purchasing the Conda Assets (Tr. at 62). At the hearing Beker stated its belief that it had obtained an offer from only one of these parties (Tr. at 63–69, 156–62); *i.e.*, a conditional offer from a Mr. McCarty, a former executive with Beker who was represented by Weiss, Peck & Greer, to purchase the Conda Assets for $21 million, $10 million, or $500,000 depending on whether the sale was consummated on August 1, 1986, later that month, or this fall, respectively (Tr. at 63–69, 156–62). Whether this offer is real is debatable. There is no evidence of its existence or that the offeror is aware of this Court's August 5, 1986 order preventing any purchaser from forcing Beker's partner, WCFL, to mine ore this fall. Moreover, the decrease in the offered price from $10 million to $500,000 if the sale is made in September rather than August appears to be designed as a pressure tactic to force a quick sale at a lower price than could otherwise be obtained.

As extensive as these marketing efforts have been, they have not yielded a satisfactory offer. There is no evidence that an auction sale at this time will draw a bid in excess of the property's liquidation or scrap value (Tr. at 329–30). The only offer Beker may have at this time is an offer for $500,000. That sum is miniscule in view of the historical earnings of the Conda Assets.

Some of Beker's competitors, moreover, are completing planned capacity expansions and bringing additional productive capacity on-line (Tr. at 374–75). To the Debtor this increased supply will result in less demand for Beker's products. But there is no evidence of such and other competitors have closed plants. The adding of capacity suggests an expectation that the market will return. It also suggests that the Conda Assets are worth far more than $500,000 even though it is unlikely that a phosphate fertilizer company will be able to operate profitably before 1988 (Tr. at 302–03). Holding the Conda Assets until it appears that a favorable change in the market cycle is likely to occur (Tr. at 283–85) could result in a substantial increase in the sale price or in their use as a vehicle to attract investments to fund a plan.

To Beker, this scenario represents a "pipe dream." It observes that, absent new financing, it cannot carry the Conda Assets until profitability is reached. But the same is apparently true of the Taft Plant. This is the critical nature of this case. Without financing, the Taft Plant will not be able to function, and the Conda Assets cannot be carried, past March 1987. At issue here is Beker's judgment to dispose of the Conda Assets now when there is no assurance on this record that it will be able to operate the Taft Plant.

II.

Where, as here, prior to the formulation and acceptance of a plan of reorganization, a debtor-in-possession seeks to sell an important asset out of the ordinary course of business free and clear of junior and senior liens on that property, for less than the aggregate amount of those liens and over the objection of a lienholder, the analysis is two-fold. First, as in every case where a debtor-in-possession seeks to sell an important asset out of the ordinary course of business and prior to the formu-

lation and acceptance of a plan of reorganization, it must be determined whether, based on the evidence presented at a hearing, there exists a good "business reason" or "articulated business justification" for ordering the sale. *Committee of Equity Security Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070–71 (2d Cir.1983). Second, because the debtor-in-possession seeks to sell the asset for a price less than the aggregate amount of the junior and senior liens on the asset over the objection of the junior lienholders and free and clear of such liens, it must be determined whether such a sale is justified by special and compelling circumstances and whether the proposed sale price is the best obtainable under the circumstances. *In re Beker Industries Corp. et al.*, 63 B.R. 474 (Bankr.S.D.N.Y.1986) (citing *In re Bernhard Altmann International Corp.*, 226 F.Supp. 201, 205–07 (S.D.N.Y.1963); *In re Hatfield Homes, Inc.*, 30 B.R. 353, 355 (Bankr.E.D.Pa.1983)).

In *Lionel*, the Second Circuit concluded that the bankruptcy court must expressly find, from evidence presented before it at a hearing, a good "business reason" or "articulated business justification" for the use, sale, or lease of property outside the ordinary course of business, before such disposition may be ordered under § 363(b). 722 F.2d at 1070–71. Notwithstanding the absence of a statutory command, the *Lionel* court held that, in determining whether to authorize a sale of estate property under § 363(b) of the Code, the protections of the plan confirmation process must be considered so that § 363(b) can be applied in a manner which does not "unnecessarily violate the congressional scheme for corporate reorganizations." 722 F.2d at 1066. Consequently the bankruptcy court, in order to "act to further the diverse interests of the debtor, creditors and equity holders", as required by *Lionel*, is to consider:

> the proportionate value of the asset to the estate as a whole, the amount of elapsed time since the filing, the likelihood that a plan of reorganization will be proposed and confirmed in the near future, the effect of the proposed disposition on future plans of reorganization, the proceeds to be obtained from the disposition vis-a-vis any appraisals of the property, which of the alternatives of use, sale or lease the proposal envisions and, most importantly perhaps, whether the asset is increasing or decreasing in value.

722 F.2d at 1071.

█ In the application of these factors, it is plainly apparent that the Conda Assets may not be sold under *Lionel* at this stage of this case. Primary among the considerations applicable here is the notion that this case is at a crucial stage where the path the Debtor will take is to be determined. The prospective negative margin of the Taft Plant in December 1986 and the expiration of the Financing Agreement on January 31, 1987 are the facts dominating the future. Thus, it would appear, as the testimony of John Sherff of ADL makes clear, that the Debtor will be forced to decide whether to close Taft, or run it at a negative margin and attempt to sell the facility and the Wingate Creek mine when the market turns.

Thus, although it cannot be said that the funding necessary for a plan will likely be present in the near term, this is a case where the Debtor, its creditors, and its shareholders will be making key decisions necessarily and dramatically affecting the contents of a plan and the ability to reorganize. Unless the DAP market turns, both the Conda Plant and the Taft Plant are in jeopardy. It cannot be said, on this record, where the evidence is that the market is not likely to turn in the near future, that disposition of one of these two principal assets will save the other.

Furthermore, it is hardly clear that the Conda Plant will not be an asset contributing to reorganization. The currently terrible market, while inducing some Conda competitors to close, has not deterred others. Thus, it is possible that Conda, if given the time, particularly in light of its fairly recent profitability, might serve as

one of the vehicles attracting the investment capital that this Debtor needs.

Moreover, the price that the Debtor's evidence indicates would likely be achieved offers no justification for the sale. An asset of this magnitude is not sold through the newspapers.[4] Meaningful bids come through marketing efforts and after detailed inspection and analysis by would-be buyers. Prospective bidders are thus known in advance of the auction. Yet the only indication Beker has of any interest is the statement that an offer would be made for only $500,000, if the sale were held after August 31, 1986. In this case, that sum is meaningless. It does not achieve the Debtor's hope to reduce interest payments through significant reduction of the loan made under the Financing Agreement. All it does is rob the asset of possible future value, make certain that the unsecured debt will be increased by the full $72 million owed to the Debentureholders, and increase the risk that there might also be a deficiency owed to the Banks.

That sum also negates any notion that to fail to sell the Conda Assets may result in receiving a lower value at a later date. Under *Lionel*, "most importantly perhaps [is] whether the asset is increasing or decreasing in value." 722 F.2d at 1071. Here the prospects of decrease are of immaterial effect and there might be a possibility for increase.

Thus, all that can be said is that to dispose of the Conda Assets now will reduce the need to fund the mothballing and maintenance of the Plant for the next few months. As noted, the Debtor has the sums available under the Financing Agreement to perform those tasks and carry the Conda Assets to the expiration of the Financing Agreement. Under the *Lionel* test, to sell the Conda Assets now is premature.

Also precluding sale of the Conda Assets is the notion that the Court may approve a sale of property free and clear of junior and senior liens pursuant to § 363(f)(3) of the Code for a price admittedly less than the aggregate amount of those liens and over the objection of the junior lienholders, only if it is justified by special circumstances and is for the best price obtainable under the circumstances. *In re Beker Industries Corp. et al.*, 63 B.R. 474 (Bankr.S.D.N.Y.1986).

At this stage, the type of compelling circumstances permitting such a sale are not presented. The lien is not in dispute, *see* 11 U.S.C. § 363(f)(4), the asset is not rapidly perishing, the sale does not propose a significant reduction of secured debt so as to decrease deficiency claims, *see Bernhard Altmann*, 226 F.Supp. at 207, and the Debtor is not being put in the dilemma where the secured creditors insist that the Debtor, in all events, be permitted neither to sell nor to abandon the property. *See In re Beker Industries Corp. et al.*, 63 B.R. at 477 (Bankr.S.D.N.Y.1986).

As there stated: "[s]ince property in which there is no equity for the general estate 'in practical essence ... belong[s] to the secured creditors,' *Bernhard Altmann*, 226 F.Supp. at 206, they, absent compelling circumstances, should sell it themselves if they object to the sale." 63 B.R. at 477. It is therefore significant that the Committee does not now oppose abandonment if this Court finds a sale at the present time to be appropriate. If any method of disposition is appropriate, it is abandonment because the Committee prefers it to sale and because the Banks will retain what they initially bargained for: their security interest in the Conda Assets. The equities lie in favor of the Committee and its preference for abandonment, rather than sale, despite the Banks' contrary position. They stand to lose the most in a manner that is inconsistent with the Debtor's expressed intention, when urging that it be permitted to enter into the Financing

4. Although the Court authorized newspaper advertising here, it did so as a means to give notice to the creditor and stockholder bodies at large in addition to the notice given directly to the three committees.

Agreement, to operate and, at least, maintain the Conda Assets.[5]

III.

We, thus, turn to Beker's alternative request that it be permitted to abandon the Conda Assets pursuant to § 554(a) of the Code. That section provides that "[a]fter notice and a hearing, the trustee [or debtor-in-possession, *see* 11 U.S.C. § 1107] may abandon any property of the estate that is burdensome to the estate or that is of inconsequential value and benefit to the estate." 11 U.S.C. § 554(a). The issue now before this Court is whether, in the context of a Chapter 11 proceeding, § 554(a) requires the bankruptcy court to approve the abandonment of property that is concededly "burdensome to the estate" or that is possibly "of inconsequential value and benefit to the estate" prior to the acceptance of and outside of any plan of reorganization when, under all the circumstances, no good business reason exists for abandonment. Stated another way, the issue is whether the *Lionel* test, *see* 722 F.2d at 1071, requiring a good business reason to be found after consideration of all salient factors in order for a court to approve a § 363(b) sale in a Chapter 11 case, should also apply to Chapter 11 abandonment cases.

This issue is parallel to that addressed in *Lionel.* Like § 363(b), § 554 "appears to permit disposition of any property of the estate of a corporate debtor without resort to the statutory safeguards embodied in Chapter 11 of the Bankruptcy Code, 11 U.S.C. § 1101 *et. seq.*" *Lionel,* 722 F.2d at 1066.[6] But it is also true that "if a bankruptcy judge is to administer a business reorganization successfully under the Code, then ... some play for the operation of both" § 554 and Chapter 11, just like that necessary for the operation of § 363(b)(1) and Chapter 11, "must be allowed for." *See Lionel,* 722 F.2d at 1071.

A finding of burdensomeness or of "inconsequential value and benefit" is generally sufficient to justify abandonment in a Chapter 7 case because it serves "the overriding purpose of bankruptcy liquidation: the expeditious reduction of the debtor's property to money, for equitable distribution to creditors...." *Midlantic National Bank v. New Jersey Department of Environmental Protection,* — U.S. —, 106 S.Ct. 755, 763, 88 L.Ed.2d 859 (1986) (Rehnquist, J., dissenting) (citation omitted). But even in Chapter 7 cases, restrictions on the trustee's power to abandon are not limited to considerations of the property's value or burdensomeness to the estate. *Midlantic,* 106 S.Ct. at 760 (Powell, J., opinion of the Court) ("Neither the Court nor Congress has granted a trustee in bankruptcy powers that would lend support to a right to abandon property in contravention of state or local laws designed to protect public health or safety.").

That a case is in Chapter 11, however, brings to the fore considerations in addition to and wholly distinct from expeditious liquidation of estate property. Chapter 11 contemplates, not only liquidation plans, *see* 11 U.S.C. § 1123(a)(5)(D), but business reorganization through "restructur[ing] a business' finances to enable it to operate productively, provide jobs for its employees, pay its creditors and produce a return for its shareholders." *Lionel,* 722 F.2d at 1070. This is accomplished through a plan

5. *See supra* n. 1. The absence of special circumstances renders unnecessary a determination of whether the sale would be for the best price obtainable under the circumstances.

6. The sections are drafted in similar terms. *Compare* 11 U.S.C. § 363(b)(1) ("The trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate.") *with* 11 U.S.C. § 554(a) ("After notice and a hearing, the trustee may abandon any property of the estate that is burdensome to the estate or that is of inconsequential value and benefit to the estate."). The additional requirement of § 554 that the property be "burdensome" or "of inconsequential value and benefit" to the estate is necessitated by the fact that abandonment does not bring any proceeds into the estate. The two sections are also similar in function: they allow for disposition of estate property in a manner that is outside the ordinary course of business and outside of a plan of reorganization.

that is to "provide adequate means" for its implementation, 11 U.S.C. § 1123(a)(5), such as through debtor retention, transfer, sale or distribution to lienholders of all or some of the property of the estate. 11 U.S.C. § 1123(a)(5)(A)–(D). The choice of these alternatives by the plan proponent, usually the debtor-in-possession, may only be confirmed after compliance with the considerable safeguards provided by Congress in §§ 1122, 1124–1129 of the Code.

Abandonment, since it contemplates removal of the subject property from the estate and its return to the debtor, is effectively a distribution of property. With the protection of the automatic stay provided by 11 U.S.C. § 362(a) no longer in place, the property can be reached by creditors. In the case of collateral, to abandon is to distribute property to the creditors who hold security interests in it for they will then be permitted to foreclose. Like a sale of property, abandonment consequently brings into play the tensions described in *Lionel* and *Pension Benefit Guaranty Corp. v. Braniff Airways, Inc. (In re Braniff Airways, Inc.)*, 700 F.2d 935, (5th Cir.1983), and echoed in *Institutional Creditors of Continental Air Lines, Inc. v. Continental Air Lines, Inc. (In re Continental Air Lines, Inc.)*, 780 F.2d 1223, 1226 (5th Cir.1986), between the plan process and the proposed disposition. We thus conclude, like the *Lionel* court, that Congress, in making § 554 applicable to Chapter 11 cases, *see* 11 U.S.C. § 103(a), intended to further the purpose of that Chapter and thus, the two statutory provisions should not "be read as mutually exclusive." *Lionel*, 722 F.2d at 1071 (Chapter 11 and § 363(b) are not to be read as mutually exclusive).

In reaching this conclusion, we recognize the strong argument that § 554 is absolute in its terms and "that a trustee's power to abandon is limited only by consideration of the property's value to the estate." *Midlantic National Bank v. New Jersey Department of Environmental Protection*, 106 S.Ct. at 763–64 (Rehnquist, J., dissenting); *see* Paige, *In Re Quanta Resources Corp.: Bankruptcy Policy v. Environmental Interests; A Polluted Judicial Theory*, 59 Am.Bankr.L.J. 357, 383 (1985). But to rule otherwise in the case of a major asset like that at issue here poses the danger of circumventing the plan process. Furthermore, the Supreme Court, in *Midlantic*, for the similar reason of accommodating the abandonment process to state and local environmental laws and ordinances, placed a more severe gloss on § 554(a) in its holding that a trustee may not abandon environmentally hazardous property in derogation of state laws that require its clean up. *Midlantic*, 106 S.Ct. at 762. Application of the *Lionel* standard to abandonment cases is consistent with that gloss. Just as Congress could not have intended § 554(a) to swallow up environmental protection statutes and ordinances, it could not have intended § 554(a) to swallow up Chapter 11's safeguards or its purpose.

Those considerations, moreover, call for adoption of the *Lionel* test rather than the "business judgment test" advocated by Beker. That test applies to the trustee's decision to reject an executory contract under § 365 of the Code. *See Control Data Corporation v. Zelman (In re Minges)*, 602 F.2d 38, 43 (2d Cir.1979); *Hunts Point Tomato Co. v. Roman Crest Fruit, Inc. (In re Roman Crest)*, 35 B.R. 939, 948–49 (Bankr.S.D.N.Y.1983). To be sure, "the concept of rejection had its roots in the principle that the trustee might abandon burdensome property," 2 *Collier on Bankruptcy* ¶ 365.03, at 365–16 (15th ed. 1986), as Beker observes. Early executory contract cases did apply a burdensomeness test. *E.g., American Brake Shoe & Foundry Co. v. New York Rys. Co.*, 278 F. 842, 844 (S.D.N.Y.1922). Yet it is also noteworthy that the standards applicable to executory contract cases have evolved separately to permit rejection of a contract that, "while profitable or generally beneficial," may be replaced by a more attractive arrangement. 2 *Collier on Bankruptcy* at 365–16; *see also Roman Crest*, 35 B.R. at 948–49 ("the debtor's power to reject, although derived from the doctrine that the

estate may abandon burdensome property, ... is to be tested by the "business judgment" standard first enunciated in *Group of Institutional Investors v. Chicago, Milwaukee, St. Paul and Pacific R. Co.*, 318 U.S. 523, 459–550, 63 S.Ct. 727, 742–743, 87 L.Ed. 959 (1943).").

More significantly, the considerable flexibility given to a debtor-in-possession by the business judgment standard, *see Control Data*, 602 F.2d at 43, is contrary to the closer scrutiny articulated by the *Lionel* court in its recognition of the protections of the Chapter 11 plan confirmation process. That closer scrutiny is required is also implicit in § 1123 of the Code. Subsection (a) of that section requires a plan to provide for its implementation by addressing the issue of retention or disposition of property. Subsection (b) permits the proponent, in its discretion, subject only to the provisions of 11 U.S.C. § 365, to assume or reject executory contracts. That distinction between mandatory inclusion and discretion requires the application of the stricter test.

In addition, there are cases, such as that presented here, where it is clear that the assets are burdensome in that they require continued funding but it is not so certain that the assets are "of inconsequential value and benefit to the estate." 11 U.S.C. § 554(a). Benefit and value in a Chapter 11 case must be deemed to include the reorganization benefit and value of attracting capital to assist in plan formulation. In a case heavily laden with secured debt, the only way of accomplishing the task "of getting creditors paid", *Grayson-Robinson Stores v. Securities and Exchange Commission,* 320 F.2d 940, 949 (2d Cir.1963) (Friendly, J.), may lie in realizing upon that value. Section 362(d) of the Code recognizes this distinction by providing for the retention of the automatic stay, notwithstanding a secured creditor's desire to foreclose and a debtor's lack of equity in the property, if the secured creditor is given adequate protection and if the property is necessary to an effective reorganization. To literally apply § 554(a) and permit abandonment of a major asset on grounds of burdensomeness without a sufficiently strong reason for denying creditors the chance to vote on the issue pursuant to the confirmation process would distort that process. We thus hold that the *Lionel* test applies to a § 554(a) motion seeking abandonment of a major asset in a Chapter 11 case.

IV.

In applying that test, it is apparent that the same reasons that preclude a sale of the Conda Assets at this time for $500,000, strongly argue against abandonment at this time with this case in its present posture.

The burdensomeness of carrying the Conda Assets, so stressed by the Debtor, is simply not sufficient at this time. Not only was it shown that the costs can be borne within the level provided by the Financing Agreement, it is perfectly clear that should it come to pass that the Conda Assets are ultimately abandoned or sold without any return to the Debtor, such as after the Financing Agreement expires on January 31, 1987 its maintenance and mothballing costs are to be reimbursed under 11 U.S.C. § 506(c). That section provides that the debtor-in-possession "may recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit to the holder of such claim." 11 U.S.C. § 506(c); *see* 11 U.S.C. § 1107.

Such expenses are, however, only allowable to the extent that either (a) the secured creditor expressly or impliedly consented to bear them, *General Electric Credit Corp. v. Levin & Weintraub et al. (In re Flagstaff Foodservice Corp.),* 739 F.2d 73, 77 (2d Cir.1984) (*"Flagstaff I"*); *In re Hotel Associates Inc.,* 6 B.R. 108, 113–14 (Bankr.E.D.Pa.1980), or (b) they are (i) necessary; (ii) of direct and primary benefit to the secured creditor; and (iii) reasonable. *General Electric Credit Corp. v. Peltz (In re Flagstaff Foodservice Corp.),* 762 F.2d 10, 12 (2d Cir.1985) (*"Flagstaff II"*); *Matter of Trim-X Inc.,* 695

F.2d 296, 299 (7th Cir.1982). As the *Flagstaff I* court reasoned, "Congress's express intent in enacting section 506(c) was to ensure that, any time a debtor in possession 'expends money to provide for the reasonable and necessary cost and expenses of preserving or disposing of a secured creditor's collateral, the ... debtor in possession is entitled to recover such expenses from the secured party or from the property securing an allowed secured claim held by such party.' 124 Cong.Rec. H11089 (daily ed. Sept. 28, 1978) (Statement of Rep. Edwards), *reprinted in* 1978 U.S.Code Cong. & Ad.News 5787, 6436, 6451." [7] *Flagstaff I,* 739 F.2d at 76.

Here both factors apply. Although such consent by a secured creditor to bear indirect costs such as professional fees "is not to be lightly inferred", *In re S & S Industries, Inc.,* 30 B.R. 395, 398 (Bankr.E.D. Mich.1983) *quoted* in *Flagstaff I,* 739 F.2d at 77, no such reluctance need apply where the expenditure consists of direct costs to preserve an asset for example by mothballing it. But even under the stricter standard, consent is obvious here.

As to the Debentureholders, the Committee has actually consented. They state: "In any event, if the Conda Assets ultimately were not included in the Debtors' reorganization, the Debtors would have recourse to 11 U.S.C. § 506(c) for any expenses incurred in maintaining an asset for the benefit of the creditors secured thereby." (Debentureholders' Post-Trial Memorandum at 11 n. 4.)

The Banks make no such statement but neither do they argue that such expenses would not be recoverable. Their consent arises from their opposition to that branch of the motion that seeks to abandon the Conda Assets on the ground that it is premature. Like the Debentureholders, they oppose the Debtor's willingness to permit them to foreclose and thereby shift these expenses to them now. Seeking to retain the possibility of future benefit by opposing abandonment, they and the Debentureholders must, therefore, be deemed to consent to bear such costs. *Cf. Trim-X,* 695 F.2d at 301 (expenses incurred by trustee to preserve secured asset from the time he filed his petition to abandon same until secured creditor filed its answer consenting to abandonment held to have benefitted the secured creditor).

Perhaps the failure of the Banks and Committee to argue to the contrary lies in the obviousness of the reimbursable nature of the expenses themselves. Indeed, it is difficult to imagine a more clear case under § 506(c).

The costs Beker has incurred and will incur to maintain and mothball the Conda Plant are necessary to preserve it. Absent such expenditures, the Conda Plant would be a rusting hulk and a prospective purchaser would be faced with exorbitant start-up costs and a long delay before the plant could be effectively operated. These expenditures will thus directly and primarily benefit the secured creditors by preserving their collateral and facilitating its disposition in the future. 3 *Collier on Bankruptcy* ¶ 506.06, at 506–50 (15th ed. 1986) ("Such costs and expenses as appraisal fees, auctioneer fees, advertising costs, moving expenses, storage charges, payroll of employees directly and solely involved with the disposition of the subject property, maintenance and repair costs, and marketing costs, would generally be found to relate to preservation or disposition and benefit the holder of the secured claim."). These expenditures, to the extent they are reasonable, *i.e.,* do not exceed those found above (*see supra* n. 3) are, therefore, entitled to treatment under § 506(c) of the Code.

Nor does the length of time to return to profitability, also argued by Beker, offer a sufficient business reason for abandoning these assets at this stage. The evidence of

7. Expenses of preservation are allowable to a debtor-in-possession against secured property whose value is less than the secured claim. *Matter of Trim-X, Inc.,* 695 F.2d 296, 299 (7th Cir.1982). "[T]he relative values of the property and the secured claim are not relevant considerations under" § 506(c). *Id.* at 298.

competitors currently increasing capacity in the fact of shut downs indicates an expected return to profitability and that the Conda Assets may have significant value. Moreover, the pressing need for Beker to come to terms with the prospective negative margin of its Taft Plant strongly indicates that the future of these two principal assets, and thus the Debtor, should be determined together since at this stage it is not apparent that the disposition of one is absolutely required to preserve the other.

Neither of these factors present any significant threat to Beker. Analysis of all the salient factors leads us to conclude that there is no good business reason or business justification for abandonment at this time in light of the overall posture of this case as a whole.[8]

The foregoing constitutes this Court's findings of fact and conclusions of law. Beker's motion to sell or abandon the Conda Assets in the current circumstances of this case is denied. If the Conda Assets or the Conda Plant are ultimately not retained by the Debtor or a successor to it in a plan of reorganization, any expenses incurred by Beker in preserving of the Conda Assets or the Conda Plant after July 14, 1986, when Beker filed its motion, are to be recovered under § 506(c) from the property to the extent these expenses do not exceed those found above or are otherwise reasonable.[9]

IT IS SO ORDERED.

8. We thus need not address whether abandonment would be in derogation of environmental laws under *Midlantic.*

9. In so ruling, we make no determination that an ultimate inclusion, if any, of the Conda Assets in a plan of reorganization will bar § 506(c) treatment. It appears that the expenses to be incurred are for the primary benefit of the secured creditors. Whether any reorganization benefit that may occur in this case is purely an incidental benefit or is also a primary benefit, *Flagstaff I,* 739 F.2d at 76, is to be determined if a plan providing for retention of the assets is confirmed.